**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

*FILED*

JUL 1 0 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

ANTOINE GUY JEAN PAUL BORDELAIS
      Petitioner,
   And

VALERIE ANN BORDELAIS,
      Respondent.

Case No.   **17-cv-04697**

---

## *PETITION FOR RETURN OF THE MINOR CHILD*

## *IN ACCORDANCE WITH THE HAGUE CONVENTION*

The Petitioner, ANTOINE BORDELAIS ("ANTOINE") in support of his Petition for Return of the Minor Child in Accordance with the Hague Convention, states as follows:

**OVERVIEW**

1. This action is brought by ANTOINE BORDELAIS, a citizen of France, resident in Switzerland, to secure the return of his thirteen year old daughter, S.B., who was wrongfully removed from Switzerland by the Respondent, VALERIE BORDELAIS ("VALERIE"), without ANTOINE's consent, and brought to Will County, Naperville, Illinois.

2. This Petition is filed pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"). A copy of the Hague Convention is attached hereto as Exhibit A. The Hague Convention came into effect in the United States of America on July 1, 1988, and has been ratified between, among other Contracting States, the United States and Switzerland.

3. The objectives of the Hague Convention are:
   a. Article 1(a): To secure the prompt return of children wrongfully removed to or retained in any Contracting State; and
   b. Article 1(b): To ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.

4. The Hague Convention authorizes a state or federal court to determine the merits of a claim for the wrongful removal or retention of a child; it does not, however, permit the court to consider the merits of any underlying custody dispute (article 16 Hague Convention).

5. By decision of April 19, 2017, the Swiss appeal court has confirmed that the abduction was wrongful under article 3 of the Hague convention by virtue of the fact that, at the time of the removal of the child, the petitioner held joint parental authority and did not consent to the move of the child to the United States of America. A copy of the decision with translation is attached hereto as Exhibit R.

6. Under article 12 of the Hague convention "*Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith*".

## FAMILY BACKGROUND

7. ANTOINE and VALERIE were married in October 1999 in Paris, France. A copy of the marriage certificate is attached hereto as Exhibit B.

8. S.B. was born in          2003, in London, United Kingdom, and is currently residing with VALERIE in Naperville, Illinois. A copy of the birth certificate is attached hereto as Exhibit C.

9. S.B. has dual citizenship, French and US. A copy of the child's French ID is attached hereto as Exhibit D.

10. The family moved from the United Kingdom to Switzerland in January 2010 to the new family home in Commugny, Switzerland. A copy of the child's Swiss residency permit is attached hereto as Exhibit E.

11. The child attended school at the Commugny then Coppet Primary School in Switzerland from January 2010 until shortly before her abduction on June 23, 2016.

12. The parties separated by mutual agreement, ratified by the Swiss Court on December 18, 2014.

13. Shortly thereafter VALERIE moved with the child to another residence in Commugny, Switzerland;

14. The parties were granted joint custody of the child, with VALERIE retaining the majority of parenting time with the child. At the time of the abduction the parties held joint custody of the child.

**REMOVAL FROM SWITZERLAND AND WRONGFUL RETENTION IN THE U.S.**

15.  VALERIE traveled with the child to the U.S. on June 23, 2016, without giving any notice to ANTOINE of said travel. A copy of the flight reservation is attached hereto as Exhibit F.

16.  The Swiss Police notified ANTOINE on July 7, 2016 that VALERIE had left Switzerland for the U.S. with their child.

17.  Based on VALERIE's continued threats to flee Switzerland with the child to the U.S., ANTOINE, knew that VALERIE had absconded with the child.

18.  The abduction was premeditated as evidenced by the fact that prior to departing in May 2016 VALERIE terminated the rental agreement for the apartment she occupied in Commugny since January 2015. A copy of the termination letter with translation is attached hereto as Exhibit G.

19.  ANTOINE immediately applied for the return of the child to the Swiss Central Authority on July 14, 2016. A copy of the return request sent to the US Central Authority is attached hereto as Exhibit H.

20.  ANTOINE then filed for divorce on July 18, 2016 with the Swiss courts. A translated copy of the notification is attached hereto as Exhibit I.

21.  Based on the fact that both the U.S. and Switzerland are parties to The Hague Convention, ANTOINE, is relying upon and requesting the application of the Convention in its full force.

22.  At the time of the child's abduction on June 23, 2016, both parents had joint parental responsibility pursuant to Article 296 of the Swiss Civil Code including but not limited to, determining the child's residence pursuant to Article 301a of Swiss Civil Code. A copy of the relevant sections of the Swiss Civil Code is attached hereto as Exhibit J.

23.  Despite VALERIE's efforts since early 2015 to frustrate ANTOINE's visitation with the child, ANTOINE made every reasonable effort to visit with his daughter and to utilize the court system to petition for court ordered visitation with his daughter.

24.  The Swiss Central Authority has confirmed that the relevant Articles of the Swiss Civil Code are applicable. A copy of the letter from the Swiss Central Authority to the US Central Authority is attached hereto as Exhibit K.

25.  ANTOINE therefore asserts that the child's removal needed his explicit consent, or alternatively a court approval.

26.  VALERIE failed to obtain a consent from ANTOINE or from the Swiss court.

27.  By decision of April 19, 2017, the Swiss appeal court has confirmed that the abduction was wrongful under article 3 of the Hague convention by virtue of the fact that, at the time of the removal of the child, the petitioner held joint parental authority and did not consent to the

move of the child to the United States of America. A copy of the decision with translation is attached hereto as Exhibit R.

28. The Convention orders the return of the child forthwith to the country of habitual residence in order to restore the pre-wrongful removal or retention status quo and 'deter parents from crossing borders in search of a more sympathetic forum for child custody' (Baran v. Beaty F.3d1340, 1344 (11th Cir. 2008), see also 22 U.S.C. Section 9001(a)(4));

29. In accordance with the declarations in the Act and the Convention, courts in the United States are empowered to determine only the rights under the Convention and not the merits of any underlying child custody claims, such are solely reserved for the courts in the State of Habitual Residence of the child.

30. Pursuant to Article 3 of the Convention, the removal and the retention of the Child is conclusively wrongful as it violated ANTOINE's custody rights as defined in Article 5 of the Convention.

## BEST INTEREST OF THE MINOR CHILD AND THE MINOR'S WISHES

31. The child has expressed her wishes to return to Switzerland to live with her father when she met with the Naperville Police Department (NDP) and the medical staff from Edwards Hospital. A copy of the NPD report is attached hereto as Exhibit L (see notes 3 and 9). A copy of Dr. Crotty's report is attached hereto as Exhibit M (see note 1). A copy of Mrs. Nemeth's report attached hereto as Exhibit N (see note 2).

32. Prior to abducting the child VALERIE was already aware of the child's very fragile psychiatric condition. These reports further show that the abduction by VALERIE has caused the child considerable additional psychological trauma.

33. Since 2003 VALERIE has been suffering from a chronic psychiatric condition requiring her to be under continuous psychiatric supervision and medication, condition which she has confirmed to Dr. Crotty (see note 4). A copy of Dr. Crotty's report is attached hereto as Exhibit M.

34. A Guardian ad Litem was appointed in Switzerland to speak with the child regarding her wishes last summer 2016.

35. The child clearly expressed her wishes and distress to be "*held against her will*" in the United States in several emails to the GAL confirming that she wanted to return to Switzerland to live with her father. A copy of the child's emails is attached hereto as Exhibit O.

36. On August 3, 2016, the GAL petitioned the Swiss court without prior consultation with the child for her immediate return to Switzerland and for her to be placed with Swiss Social Services.

37. When the child found out about this petition for placement with Swiss Social Services it caused her a tremendous amount of fear. The child considered that the GAL had betrayed her and she lost confidence in the court refusing since to have any further conversation with any court representative.

38. To complicate matters, since the child expressed her wishes to return to Switzerland to live with her father VALERIE has manipulated the child extensively to remain in the US, to the point that the child is no longer able to express her wishes freely and independently. Due to VALERIE's manipulation, as well as the fear of entering the Swiss Social Services upon arrival in Switzerland, the child will no longer express her true wishes to return home to Switzerland. On August 29th, 2016, the Swiss courts therefore appointed a clinician, Dr. Auberjonois of Geneva University Hospital, Switzerland, in order to address the family conflict, treat the child's current psychiatric difficulties and understand the child's wishes. A translated copy of Dr. Auberjonois' acceptance of her Court mandate is attached hereto as Exhibit P.

39. The Swiss court determined that only a Swiss clinician would be in a position to communicate with the child in her native language, to understand the child's current wishes in relation to her return to Switzerland and to ascertain how she would return to her normal life in Switzerland given the extensive manipulation she has been the subject of. Dr. Auberjonois has expressed the need to meet the child in person at her clinic in Geneva, Switzerland. A translated copy of Dr. Auberjonois' letter to the Court is attached hereto as Exhibit Q.

40. VALERIE has systematically objected to the child having any contact with the Swiss court appointed clinician Dr Auberjonois. The Swiss court has been petitioned to enforce Dr Auberjonois' mandate.

**WHEREFORE,** the Petitioner, ANTOINE BORDELAIS, respectfully requests that this Court enter an Order:

A. Scheduling an expedited preliminary injunction hearing;

B. Advancing and consolidating the trial on the merits with the preliminary hearing;

C. Ordering the Respondent to immediately return the minor child to Switzerland, her habitual residence;

D. Awarding to the Petitioner, his parenting time and access rights to the child, as granted by the Swiss courts;

E. Ordering the Respondent to pay for all of the child's travel, accommodations and other costs related to all her visits and her return to Switzerland.

F. Providing to the Petitioner such further relief as the Court finds just and equitable.

**PROTECTIVE MEASURES AND INTERIM RELIEF**

G. The Petitioner respectfully requests that during the proceedings on an interim basis, the child be restrained geographically to the State of Illinois, such that the Respondent is not authorized to take the child outside the State or the US as a whole, without leave of the court;

H. The Petitioner respectfully requests that the child's passport shall be held in the court's custody for the duration of the proceedings;

I. The Petitioner respectfully requests immediate restoration of his access rights to the child in order to preserve the child-parent relationship;

J. The Petitioner respectfully requests enforcement of the Swiss court's mandate of Dr Auberjonois as well as the appointment of Dr Auberjonois as joint expert clinician for the US and Swiss courts to assess the child's current psychiatric difficulties and to attempt to understand the child's wishes.

K. The Petitioner respectfully requests, therefore, that the Child be ordered to visit Geneva, Switzerland, for a period of one week at the first available opportunity to consult with the joint court appointed expert Dr Auberjonois, all travel costs to be paid by the Respondent under article 26 of the Convention.

ANTOINE BORDELAIS

## *VERIFICATION BY CERTIFICATION*

UNDER PENALTIES, as provided by law pursuant to Section 1-109 of the Code of Civil Procedure and Illinois Supreme Court Rule 902(b), the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies, as aforesaid, the belief that the same are true. I further state that I have provided to the attorney who has signed this document information, which, to the best of my knowledge and belief, is true and accurate. I further state that this pleading is being filed with my consent and as part of my attorney's required duties in representing me. I further state that my attorney has explained to me that by signing this verification, I am acknowledging that my attorney is acting with my consent and at my direction and that my attorney has based his or her statement on the factual information provided to him or her by me.

DATED: June 22, 2017    _____

ANTOINE BORDELAIS

- 7 -



EXHIBIT

*tabbies*

*A*

## EXHIBIT B—HAGUE CONVENTION
# HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION

The States signatory to the present Convention, Firmly convinced that the interests of children are of paramount importance in matters relating to their custody, Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access,

Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions -

## CHAPTER I - SCOPE OF THE CONVENTION

### Article 1

The objects of the present Convention are -

a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

### Article 2

Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.

### Article 3

The removal or the retention of a child is to be considered wrongful where -

a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention;

and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

### Article 4

The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights.

The Convention shall cease to apply when the child attains the age of 16 years.

### Article 5

For the purposes of this Convention -

a) 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

b) 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

## CHAPTER II - CENTRAL AUTHORITIES

### Article 6

A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities.

Federal States, States with more than one system of law or States having autonomous territorial organizations shall be free to appoint more than one Central Authority and to specify the territorial extent of their powers. Where a State has appointed more than one Central Authority, it shall designate the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State.

### Article 7

Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.

In particular, either directly or through any intermediary, they shall take all appropriate measures -

a) to discover the whereabouts of a child who has been wrongfully removed or retained;

b) to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;

c) to secure the voluntary return of the child or to bring about an amicable resolution of the issues;

d) to exchange, where desirable, information relating to the social background of the child;

e) to provide information of a general character as to the law of their State in connection with the application of the Convention;

Case: 1:17-cv-04697 Document #: 11 Filed: 07/10/17 Page 10 of 73 PageID #:241

f) to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access;

g) where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;

h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;

i) to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

## CHAPTER III - RETURN OF CHILDREN

### Article 8

Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child.

The application shall contain -

a) information concerning the identity of the applicant, of the child and of the person alleged to have removed or retained the child;

b) where available, the date of birth of the child;

c) the grounds on which the applicant's claim for return of the child is based;

d) all available information relating to the whereabouts of the child and the identity of the person with whom the child is presumed to be.

The application may be accompanied or supplemented by -

e) an authenticated copy of any relevant decision or agreement;

f) a certificate or an affidavit emanating from a Central Authority, or other competent authority of the State of the child's habitual residence, or from a qualified person, concerning the relevant law of that State;

g) any other relevant document.

### Article 9

If the Central Authority which receives an application referred to in Article 8 has reason to believe that the child is in another Contracting State, it shall directly and without delay transmit the application to the Central Authority of that Contracting State and inform the requesting Central Authority, or the applicant, as the case may be.

### Article 10

The Central Authority of the State where the child is shall take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child.

### Article 11

The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.

If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay. If a reply is received by the Central Authority of the requested State, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.

### Article 12

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.

### Article 13

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that -

a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

### Article 14

In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

### Article 15

The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination.

### Article 16

After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.

### Article 17

The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

### Article 18

The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.

### Article 19

A decision under this Convention concerning the return of the child shall not be taken to be determination on the merits of any custody issue.

Case: 1:17-cv-04697 Document #: 11 Filed: 07/10/17 Page 13 of 73 PageID #:244

### Article 20

The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

## CHAPTER VI - RIGHTS OF ACCESS

### Article 21

An application to make arrangements for organizing or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child.

The Central Authorities are bound by the obligations of co-operation which are set forth in Article 7 to promote the peaceful enjoyment of access rights and the fulfillment of any conditions to which the exercise of those rights may be subject. The Central Authorities shall take steps to remove, as far as possible, all obstacles to the exercise of such rights. The Central Authorities, either directly or through intermediaries, may initiate or assist in the institution of proceedings with a view to organizing or protecting these rights and securing respect for the conditions to which the exercise of these rights may be subject.

### Article 22

No security, bond or deposit, however described, shall be required to guarantee the payment of costs and expenses in the judicial or administrative proceedings falling within the scope of this Convention.

### Article 23

No legalization or similar formality may be required in the context of this Convention.

### Article 24

Any application, communication or other document sent to the Central Authority of the requested State shall be in the original language, and shall be accompanied by a translation into the official language or one of the official languages of the requested State or, where that is not feasible, a translation into French or English.

However, a Contracting State may, by making a reservation in accordance with Article 42, object to the use of either French or English, but not both, in any application, communication or other document sent to its Central Authority.

### Article 25

Nationals of the Contracting States and persons who are habitually resident within those States shall be entitled in matters concerned with the application of this Convention to legal aid and advice in any other Contracting State on the same conditions as if they themselves were nationals of and habitually resident in that State.

### Article 26

Each Central Authority shall bear its own costs in applying this Convention.

Central Authorities and other public services of Contracting States shall not impose any charges in relation to applications submitted under this Convention. In particular, they may not require any payment from the applicant towards the costs and expenses of the proceedings or, where applicable, those arising from the participation of legal counsel or advisers. However, they may require the payment of the expenses incurred or to be incurred in implementing the return of the child.

However, a Contracting State may, by making a reservation in accordance with Article 42, declare that it shall not be bound to assume any costs referred to in the preceding paragraph resulting from the participation of legal counsel or advisers or from court proceedings, except insofar as those costs may be covered by its system of legal aid and advice.

Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

### Article 27

When it is manifest that the requirements of this Convention are not fulfilled or that the application is otherwise not well founded, a Central Authority is not bound to accept the application. In that case, the Central Authority shall forthwith inform the applicant or the Central Authority through which the application was submitted, as the case may be, of its reasons.

### Article 28

A Central Authority may require that the application be accompanied by a written authorization empowering it to act on behalf of the applicant, or to designate a representative so to act.

### Article 29

This Convention shall not preclude any person, institution or body who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention.

### Article 30

Any application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, together with documents and any other information appended thereto or provided by a Central Authority, shall be admissible in the courts or administrative authorities of the Contracting States.

Case: 1:17-cv-04697 Document #: 11 Filed: 07/10/17 Page 15 of 73 PageID #:246

### Article 31

In relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units -

a) any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State;

b) any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in that State where the child habitually resides.

### Article 32

In relation to a State which in matters of custody of children has two or more systems of law applicable to different categories of persons, any reference to the law of that State shall be construed as referring to the legal system specified by the law of that State.

### Article 33

A State within which different territorial units have their own rules of law in respect of custody of children shall not be bound to apply this Convention where a State with a unified system of law would not be bound to do so.

### Article 34

This Convention shall take priority in matters within its scope over the Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors, as between Parties to both Conventions. Otherwise the present Convention shall not restrict the application of an international instrument in force between the State of origin and the State addressed or other law of the State addressed for the purposes of obtaining the return of a child who has been wrongfully removed or retained or of organizing access rights.

### Article 35

This Convention shall apply as between Contracting States only to wrongful removals or retentions occurring after its entry into force in those States.

Where a declaration has been made under Article 39 or 40, the reference in the preceding paragraph to a Contracting State shall be taken to refer to the territorial unit or units in relation to which this Convention applies.

### Article 36

Nothing in this Convention shall prevent two or more Contracting States, in order to limit the restrictions to which the return of the child may be subject, from agreeing among themselves to derogate from any provisions of this Convention which may imply such a restriction.

## CHAPTER VI - FINAL CLAUSES

### *Article 37*

The Convention shall be open for signature by the States which were Members of the Hague Conference on Private International Law at the time of its Fourteenth Session.

It shall be ratified, accepted or approved and the instruments of ratification, acceptance or approval shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

### *Article 38*

Any other State may accede to the Convention. The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

The Convention shall enter into force for a State acceding to it on the first day of the third calendar month after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such a declaration will also have to be made by any Member State ratifying, accepting or approving the Convention after an accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Kingdom of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the first day of the third calendar month after the deposit of the declaration of acceptance.

### *Article 39*

Any State may, at the time of signature, ratification, acceptance, approval or accession, declare that the Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect at the time the Convention enters into force for that State.

Such declaration, as well as any subsequent extension, shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

### *Article 40*

If a Contracting State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.

Any such declaration shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands and shall state expressly the territorial units to which the Convention applies.

### Article 41

Where a Contracting State has a system of government under which executive, judicial and legislative powers are distributed between central and other authorities within that State, its signature or ratification, acceptance or approval of, or accession to this Convention, or its making of any declaration in terms of Article 40 shall carry no implication as to the internal distribution of powers within that State.

### Article 42

Any State may, not later than the time of ratification, acceptance, approval or accession, or at the time of making a declaration in terms of Article 39 or 40, make one or both of the reservations provided for in Article 24 and Article 26, third paragraph. No other reservation shall be permitted.

Any State may at any time withdraw a reservation it has made. The withdrawal shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands. The reservation shall cease to have effect on the first day of the third calendar month after the notification referred to in the preceding paragraph.

### Article 43

The Convention shall enter into force on the first day of the third calendar month after the deposit of the third instrument of ratification, acceptance, approval or accession referred to in Articles 37 and 38.

Thereafter the Convention shall enter into force -

(1) for each State ratifying, accepting, approving or acceding to it subsequently, on the first day of the third calendar month after the deposit of its instrument of ratification, acceptance, approval or accession;

(2) for any territory or territorial unit to which the Convention has been extended in conformity with Article 39 or 40, on the first day of the third calendar month after the notification referred to in that Article.

### Article 44

The Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 43 even for States which subsequently have ratified, accepted, approved it or acceded to it.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands at least six months before the expiry of the five year period. It may be limited to certain of the territories or territorial units to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Case: 1:17-cv-04697 Document #: 11 Filed: 07/10/17 Page 18 of 73 PageID #:249

*Article 45*

The Ministry of Foreign Affairs of the Kingdom of the Netherlands shall notify the States Members of the Conference, and the States which have acceded in accordance with Article 38, of the following -

(1) the signatures and ratifications, acceptances and approvals referred to in Article 37;

(2) the accessions referred to in Article 38;

(3) the date on which the Convention enters into force in accordance with Article 43;

(4) the extensions referred to in Article 39;

(5) the declarations referred to in Articles 38 and 40;

(6) the reservations referred to in Article 24 and Article 26, third paragraph, and the withdrawals referred to in Article 42;

(7) the denunciations referred to in Article 44.

In witness whereof the undersigned, being duly authorized thereto, have signed this Convention.

Done at The Hague, on the 25th day of October, 1980, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Kingdom of the Netherlands, and of which a certified copy shall be sent, through diplomatic channels, to each of the States Members of the Hague Conference on Private International Law at the date of its Fourteenth Session.

**EXHIBIT**

**B**

### *TRANSLATION*

#### *EXTRACT OF THE REGISTER OF MARRIAGES, ISSUED IN GARCHES (92), FRANCE*

BORDELAIS Antoine Guy Jean Paul    and    STILWELL Valerie Ann

No. 78 - On October the second nineteen hundred and ninety-nine, at three p.m., publicly appeared before Us in the Town Hall: Antoine Guy Jean Paul BORDELAIS, consulting engineer, born in Valenciennes (Nord) on ▬▬ 1963, domiciled in Garches (Hauts-de-Seine), at 47, rue Henri Régnault, son of Paul Auguste Jean Louis BORDELAIS, retired, and of Anna Joséphine Guillemine VRANKEN, sales assistant, both domiciled in Garches (Hauts-de-Seine), at 47, rue Henri Régnault, on the one hand. And Valerie Ann STILWELL, consulting engineer, born in Hartford, Connecticut (USA) on ▬▬ 1965, domiciled in London (Great Britain), at 11 Draycott Place, SW3 25E, daughter of Richard William STILWELL, retired, and of Gail Ann KEENAN, no calling, both domiciled in the United States - 2650 Copperfield Court, Naperville, IL 60565-4300, divorced of Theodore Richard HERBIG on January 30, 1997, on the other hand. In answer to our query, the bride and groom declared that they filed a prenuptial agreement on September 13, 1999 with Maître Maxime VINATIER, Notary, partner of the firm styled "Hervé ECLANCHER et Maxime VINATIER", notaries of a professional partnership ("société civile professionnelle"), holder of a notarial office in Paris. They declared one after the other that they were willing to take each other as husband and wife and, in the name of the Law, We joined them in marriage. In the presence of Guy Jean-Paul Antoine BORDELAIS, export executive, domiciled in Garches (Hauts-de-Seine), at 47, rue Henri Régnault, of Jean-Paul Antoine Guillaume BORDELAIS, computer scientist, domiciled in Paris-12 (City of Paris) at 67, avenue Ledru-Rollin, and of Sandra Lee STILWELL, w/o: MORA, no calling, domiciled in the United States at 4949 Klusman Avenue, Alta Loma, California 91737, witnesses of legal age. After reading this document, the spouses and the witnesses signed it with Us, Claude JACQUARD, first Deputy Mayor of Garches, Civil Status Officer in the absence of the Mayor, the other deputies being detained.

*[Signatures]*

CITY OF GARCHES (92)
Certifed true copy of the original, issued in Garches on December 1, 1999.
*[Signature of Civil Status Officer and seal of the Town Hall of Garches (Hauts-de-Seine)]*
*I, the undersigned certified court translator with and for the Court of Appeals of Paris, France, duly commissioned and sworn, do hereby certify that the foregoing is to the best of my knowledge and belief a true and faithful translation from the French of the document referenced NE VARIETUR #* 951079

Ivan CHERKASSOF
INTERPRÈTE TRADUCTEUR EN LANGUES
ANGLAISE ET AMERICAINE
EXPERT PRÈS LA COUR
D'APPEL DE PARIS

N°78 - Le deux octobre mil neuf cent quatre vingt dix neuf <u>BORDELAIS</u>
à quinze heures, devant Nous ont comparu publiquement en── Antoine
la Maison commune : Antoine Guy Jean Paul <u>BORDELAIS</u>,────── Guy
ingénieur conseil, né à Valenciennes (Nord) le ▆▆▆ 1963Jean
domicilié à Garches (Hauts-de-Seine) 47, rue Henri──────── Paul
Régnault, fils de Paul Auguste Jean Louis BORDELAIS,──────
retraité, et de Anna Joséphine Guillemine VRANKEN,────────
assistante des ventes, domiciliés à Garches (Hauts-de─────
Seine) 47, rue Henri Régnault, d'une part. Et Valerie Ann─
<u>STILWELL</u>, ingénieur conseil, née à Hartford Connecticut───
(USA) le ▆▆▆ 1965, domiciliée à Londres (Grande────
Bretagne) 11 Draycott Place, SW3 25E, fille de Richard────
William STILWELL, retraité et de Gail Ann KEENAN, sans──── et
profession, domiciliés aux Etats-Unis - 2650 Copperfield──
Court Naperville IL60565-4300. Divorcée de Theodore───────
Richard HERBIG depuis le 30 janvier 1997, d'autre part.───
Sur notre interpellation, les futurs époux ont déclaré────
qu'un contrat de mariage a été reçu le 13 septembre 1999──
par Maître Maxime VINATIER, notaire, associé de la société
dénommée ''Hervé ECLANCHER et Maxime VINATIER, notaires───
associés d'une société civile professionnelle, titulaire── <u>STILWELL</u>
d'un office notarial à Paris. Ils ont déclaré l'un après── Valerie
l'autre vouloir se prendre pour époux et Nous avons─────── Ann
prononcé, au nom de la loi, qu'ils sont unis par le───────
mariage. En présence de Guy Jean-Paul Antoine BORDELAIS,──
cadre export, domicilié à Garches (Hauts-de-Seine) 47, rue
Henri Régnault, de Jean-Paul Antoine Guillaume BORDELAIS,-
informaticien, domicilié à Paris 12e arrondissement (ville
de Paris) 67, avenue Ledru-Rollin, de Sandra Lee───────
STILWELL épouse MORA, sans profession, domiciliée aux─────
Etats-Unis 4949 Klusman avenue Alta Loma, Californie 91737
témoins majeurs. Lecture faite et invités à lire l'acte───
les époux et les témoins ont signé avec nous, Claude──────
JACQUARD, premier adjoint au Maire de Garches, officier───
de l'état-civil en l'absence du Maire et par empêchement──
de tous les autres adjoints./.HD./.

<u>VILLE DE GARCHES (92)</u>
Photocopie certifiée conforme à l'acte original

Garches
le

0 1 DEC. 1999

L'Officier de l'Etat-Civil



**EXHIBIT**

**C**

## CERTIFIED COPY
Pursuant to the Births and

## OF AN ENTRY
Deaths Registration Act 1953

| | |
|---|---|
| **BIRTH** | Entry No. 261 |

| Registration district | Kensington and Chelsea | **Administrative area** Royal Borough of Kensington and Chelsea |
|---|---|---|
| Sub-district | Kensington and Chelsea | |

**CHILD**

1. Date and place of birth
   ▓▓▓▓ 2003
   Chelsea and Westminster Hospital, Chelsea

2. Name and surname
   ▓▓▓▓▓▓

   3. Sex
   Female

**FATHER**

4. Name and surname
   Antoine Guy Jean - Paul BORDELAIS

5. Place of birth
   France

6. Occupation
   Information Technology Consultant

**MOTHER**

7. Name and surname
   Valerie Ann BORDELAIS

8.(a) Place of birth
   United States of America

8.(b) Occupation
   Organisation and Development Consultant

9.(a) Maiden surname
   STILWELL

9.(b) Surname at marriage if different from maiden surname

10. Usual address (if different from place of child's birth)
    Flat 3, 11 Draycott Place, London, SW3

**INFORMANT**

11. Name and surname (if not the mother or father)

12. Qualification
    Mother

13. Usual address
    (if different from
    that in 10 above)

14. I certify that the particulars entered above are true to the best of my knowledge and belief
    Valerie Ann Bordelais

    Signature
    of informant

15. Date of registration
    Second December 2003

16. Signature of registrar
    Caroline Partridge Deputy Registrar

17. Name given
    after registration,
    and surname

Certified to be a true copy of an entry in a register in my custody.



{ *Superintendent Registrar* *Registrar

*Strike out whichever does not apply

Date 02.12.03

CAUTION: THERE ARE OFFENCES RELATING TO FALSIFYING OR ALTERING A CERTIFICATE AND USING
OR POSSESSING A FALSE CERTIFICATE. ®CROWN COPYRIGHT

**WARNING: A CERTIFICATE IS NOT EVIDENCE OF IDENTITY.**



EXHIBIT

D



Adresse : CHEMIN DES MOILLES 28A
1801 COUDRAY ( SUISSE )

Carte valable jusqu'au : 12.09.2023
délivrée le : 13.09.2013
par : CONSULAT GÉNÉRAL DE FRANCE À GENÈVE ( SUISSE )
Signature de l'autorité :

Marine RUSSET
Consul Adjoint

EXHIBIT

E

tabbies



F

**info**

Objet: TR: ebookers travel confirmation - 23 Jun - (Itin# 7189063076554)

From: **ebookers Switzerland** <support@mailer.ebookers.ch>
Date: Mon, Jun 13, 2016 at 7:38 PM
Subject: ebookers travel confirmation - 23 Jun - (Itin# 7189063076554)
To: valeriebordelais724@gmail.com



# Thanks!

Your reservation is booked and confirmed. There is no need to call us to reconfirm this reservation.

## Chicago

23 Jun 2016 - 2 Aug 2016

Because you booked a flight, you qualify for up to 7% off Chicago hotels.
Expires Thu, 23 Jun

See hotels

See live updates to your itinerary, anywhere and anytime.

See your itinerary

Before you go



i

This email can be used as an E-ticket.

- To manage your booking or check in online (where available) please visit our Manage my Flight (Opens a new window) page, select your airline and use the booking reference provided below.
- All passengers travelling to the US must provide valid travel documents and details of their full US destination address for US Immigration.
- Proof of citizenship is required for international travel. Be sure to bring all necessary documentation (e.g. passport, visa, transit permit). To learn more, visit our Visa and Passport page (Opens a new window) . For local destination and health advice, check the Foreign and Commonwealth Office website (Opens a new window)

- Remember to bring your itinerary and government-issued photo ID for airport check-in and security.

## Contact the airline to confirm:
- specific seat assignments
- special meals
- frequent flyer point awards
- special assistance requests

---

## Flight overview



**Your reservation is booked and confirmed. There is no need to call us to reconfirm this reservation.**

**Confirmation**
72HBZJ (British Airways)

**Booking ID**
72HBZJ

**Ticket #**
1259155037053 (Valerie Ann Bordelais)
1259155037054

**Travel dates**
23 Jun 2016 - 2 Aug 2016

**Itinerary #**

7189063076554

---

⊗**Departure** Thu, 23 Jun

British Airways 727

**Geneva (GVA)**     →     **London (LHR)**
11:50                          12:40
Terminal: 1                    Terminal: 5

**Cabin:** Economy
1h 50m duration

---

🕒 4h 20m stop London (LHR)

---

British Airways 1546 operated by AMERICAN AIRLINES

**London (LHR)**     →     **Chicago (ORD)**
17:00                          19:40
Terminal: 3                    Terminal: 5

**Cabin:** Economy
8h 40m duration
**Seat:** 39E, 39G | Confirm or change seats with the airline*

---

**Total Duration**

14h 50m

---

✖ **Return** Mon, 1 Aug

British Airways 1601 operated by AMERICAN AIRLINES

**Chicago (ORD)**     →     **London (LHR)**
22:25                          12:05 +1 day
Terminal: 3                    Terminal: 3
                               Arrives on 2 Aug 2016

**Cabin:** Economy
7h 40m duration
**Seat:** 33E, 33G | Confirm or change seats with the airline*

---

🕒 1h 50m stop London (LHR)

---

3

**EXHIBIT**

G

*TRANSLATION:*

Valerie Bordelais
Route de Marnex 22A
1291 Commugny

RILSA S.A.
Rue de Lion d'Or 6
Av. Benj-Constant
Case Postale 7319
1002 Lausanne

May 30, 2016

The apartment at Route de Marnex 22A, 1291 Commungy

Dear Sir or Madam,

I regret to advise that my daughter and I must dispose of the apartment Route de Marnex 22A. Would you please consider this the beginning of the notice period of 4 months (June-September). I hope to find someone to take over my lease once I have found a new apartment. If you know of anyone willing to move during the Summer, please let me know. It's a nice apartment in an ideal location with very good neighbors. Unfortunately my daughter must go to a new school which is too far from here.

Please let me know if I must send a original copy of this letter or if the digitized version (scanned) is acceptable.

I thank you.

Sincerely,


Valerie Bordelais
076.559.12.47

Valerie Bordelais
Route de Marnex 22A
1291 Commugny

RILSA S.A.
Rue de Lion d'Or 6
Av. Benj.-Constant
Case Postale 7319
1002 Lausanne

30 Mai 2016

L'appartement de Route de Marnex 22A, 1291 Commugny

Cher Monsieur ou Madame,

Je suis désolée de dire que ma fille et je dois passer de l'appartement Route de Marnex 22A. S'il vous plaît considérer ce début de la période de préavis de 4 mois (Juin-Septembre). J'espère trouver quelqu'un pour reprendre mon bail une fois que je trouve un nouvel appartement. Si vous connaissez quelqu'un qui peut se déplacer en cours de l'été, s'il vous plaît laissez-moi savoir. Il est un bel appartement dans un emplacement idéal avec de très bons voisins. Malheureusement, ma fille doit aller à une nouvelle école qui est trop loin d'ici.

S'il vous plaît laissez-moi savoir si je dois envoyer une copie originale de cette lettre ou si la version numérisée (scanned) est acceptable.

Je vous remercie.

Cordialement,

Valerie Bordelais
076.559.12.47



**EXHIBIT**



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Federal Department of Justice and Police FDJP
**Federal Office of Justice FOJ**
Private International Law Unit

---

VAL, FOJ, Bundesrain 20, 3003 Berne, Switzerland

**FEDERAL EXPRESS**
Office of Children's Issues
(CA/OCS/CI)
U.S. Department of State SA-29
2100 Pennsylvania Ave. NW, 4th
Floor
2201 C Street, N.W.
20037 Washington DC

Your reference :
Our reference : LK 158 /VAL / VAL

Berne, 15 July 2016

**Hague Convention of October 25, 1980 on the civil aspects of international child abduction (HC 80)**

████████████████████████

Dear Madam, Sir,

Please find enclosed a new application for return filed by the father of the abovementioned child.

The parents are married and have joint parental responsibility (art. 296 Swiss civil code). According to Article 301a of the Swiss civil code, if parents have joint parental responsibility the child may only move abroad permanently with the consent of the other parent or on the basis of a decision made by a court or the child protection authority. In the present case, the father did not give his consent to a stay in the USA and no judicial decision has been taken.

Although legal proceedings concerning the protection of the marital union (proceedings to decide on the legal aspects of the separation, but not divorce) have been initiated, no definite decision has been taken, and the shared parental responsibility has not been restricted in any way. Therefore, the parents have shared parental responsibility, which includes the joint right to decide on the child's residence, as explained above. It therefore appears that the removal of the child to the USA by her mother was wrongful in the sense of art. 3 of the Convention.

Filing this request, the child's father mentioned his daughter to suffer from depressions as well as suicidal thoughts. He pointed out that the child requires urgent psychiatric care by the family psychiatrist in a Geneva hospital. Further, the applicant states that the child's mother, Valerie Borde-

Lara von Arx
Bundesrain 20, 3003 Berne, Switzerland
Telephone : +41 (0)58 460 52 01
Lara.vonarxirh@bj.admin.ch
http://www.bj.admin.ch



2

lais, suffers from chronic depression, anxiety crises and schizophrenia, reasons for which she underwent medical treatment since 2003.

You will find more details on the application form.

The child is thought to be at one of the following addresses:

1. Mr. & Mrs. R Stilwell (maternal grandparents)
   2650 Copperfield Court, Naperville 60565, IL, USA

2. Mrs Sandra Lee Mora (the mother's sister)
   Rancho Cucamonga, CA, USA

3. Ms. Beth Herndon (close acquaintance of the mother)
   Atlanta, Pathway 360 Consulting LLC, Atlanta, GA, USA

We kindly request to take urgent measures for the localization of the child and to take all appropriate measures foreseen by the Hague Convention for a prompt return of ▮▮▮▮ to Switzerland.

Further, we kindly ask you to verify whether the mother has filed a lawsuit in the USA to modify the rights of custody. In the affirmative case, we kindly ask you to inform the Court about the terms of art. 16 of the Hague Convention.

We would appreciate it very much if you could acknowledge receipt of this request and keep us informed about the progress in this case, specially about the efforts undertaken with regards to the localisation. If you have any questions or need further information or documentation from our side, please do not hesitate to contact us.

Yours faithfully

Lara von Arx

Enclosure:
-Request for return and its enclosures
-Authorization to release case information and Voluntary return letter acknowledgment
-Request for pro bono legal assistance.
-Articles 296 and 301a Swiss civil code.

EXHIBIT

tabbies

I

*TRANSLATION:*

**COUNTY COURT FOR THE COTE**

St-Cergue road 38
1260 Nyon

**COURRIER A**

Mister
Antoine Guy Jean Paul BORDELAIS
Chemin des Marais 28A
1291 Commugny

| N/ref | V/ref | Date |
|---|---|---|
| TD16.033412/LGN/coi | | August 31st, 2016 |
| (to remind in all correspondence) | | |

Divorce upon unilateral demand BORDELAIS-STILWELL

Mister,

I advise Me Michellod and Me Prior that M. Antoine BORDELAIS has initiated a demand for divorce by petition filed on July 18th, 2016.

The said petition is notified to Me Michellod and Me Prior.

The hearing of Protective measures for the conjugal union of September 14th, 2016 at 15h00 is converted into a hearing for provisional measures and conciliation of the case.

Would you please receive, Mister, the expression of my best consideration.

The president

L. Guignard

Recipients :   - Mister Antoine Guy Jean Paul BORDELAIS
               - Maitre Axelle PRIOR
               - Maitre Patricia MICHELLOD



**TRIBUNAL D'ARRONDISSEMENT**
**DE LA COTE**

Route de St-Cergue 38
1260 Nyon

**COURRIER A**

Monsieur
Antoine Guy Jean Paul BORDELAIS
Chemin des Marais 28A
1291 Commugny

N/réf                          V/réf                    Date
TD16.033412/LGN/coi                                     31 août 2016
(à rappeler dans toute correspondance)

Divorce sur demande unilatérale BORDELAIS-STILWELL

Monsieur,

J'informe Me Michellod et Me Prior que M. Antoine BORDELAIS a ouvert action en divorce par demande déposée le 18 juillet 2016.

Ladite demande est notifiée à Me Michellod et Me Prior.

L'audience de mesures protectrices de l'union conjugale du 14 septembre 2016 à 15h00 est transformée en audience de mesures provisionnelles et de conciliation sur le fond.

Veuillez agréer, Monsieur, l'assurance de ma considération distinguée.

Le président

L. Guignard

Destinataires : - Monsieur Antoine Guy Jean Paul BORDELAIS
                - Maître Axelle PRIOR
                - Maître Patricia MICHELLOD

Téléphone 022 557 52 00    Fax 022 557 52 22    CCP 12-6750-6

23920


EXHIBIT

J


Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

# 210

*English is not an official language of the Swiss Confederation. This translation is provided for information purposes only and has no legal force.*

## Swiss Civil Code

of 10 December 1907 (Status as of 1 January 2016)

**Please note:** this translation does not yet include the amendments of 1.1.2017

*The Federal Assembly of the Swiss Confederation,*

based on Article 64 of the Federal Constitution[1],[2] and having considered the Dispatch of the Federal Council dated 28 May 1904[3],

*decrees:*

## Introduction

**Art. 1** A. Application of the law

A. Application of the law

[1] The law applies according to its wording or interpretation to all legal questions for which it contains a provision.

[2] In the absence of a provision, the court[1] shall decide in accordance with customary law and, in the absence of customary law, in accordance with the rule that it would make as legislator.

[3] In doing so, the court shall follow established doctrine and case law.

[1] Term in accordance with No I 1 of the Federal Act of 26 June 1998, in force since 1 Jan. 2000 (AS **1999** 1118; BBl **1996** I 1). This amendment is taken into consideration throughout the Code.

**Art. 2** B. Scope and limits of legal relationships / I. Acting in good faith

B. Scope and limits of legal relationships

I. Acting in good faith

[1] Every person must act in good faith in the exercise of his or her rights and in the performance of his or her obligations.

[1] Amended by No I 1 of the Federal Act of 25 June 1976, in force since 1 Jan. 1978 (AS **1977** 237; BBl **1974** II 1).

**Art. 295**[1]J. Rights of the unmarried mother

J. Rights of the unmarried mother

[1] Up to one year after the birth at the latest, the mother may file a claim against the father or his legal heirs for compensation:[2]

**1.**

in respect of the confinement costs;

**2.**

in respect of the costs of maintenance for at least four weeks prior to the birth and at least eight weeks thereafter;

**3.**

in respect of other expenses rendered necessary by the pregnancy or confinement, including the initial equipment for the child.

[2] On grounds of equity, the court may award partial or full compensation for such costs if the pregnancy ends prematurely.

[3] Third-party payments to which the mother is entitled by law or by contract must be taken into consideration to the extent justified in the circumstances.

[1] Amended by No I 1 of the Federal Act of 25 June 1976, in force since 1 Jan. 1978 (AS **1977** 237; BBl **1974** II 1).

[2] Amended by Annex 1 No II 3 of the Civil Procedure Code of 19 Dec. 2008, in force since 1 Jan. 2011 (AS **2010** 1739; BBl **2006** 7221).

**Section Three: Parental Responsibility**[13]

**Art. 296**[1]A. Principles

A. Principles

[1] Parental responsibility serves the well-being of the child.

[2] Until such time as they attain the age of majority, children remain the joint parental responsibility of their father and mother.

[3] Parents who are minors or subject to a general deputyship may not exercise parental responsibility. When the parents attain the age of majority, they are assigned parental responsibility. If the general deputyship is revoked, the child protection authority shall assign parental responsibility in a manner appropriate to the child's well-being.

[1] Amended by No I of the Federal Act of 21 June 2013 (Parental Responsibility), in force since 1 July 2014 (AS **2014** 357; BBl **2011** 9077).

**Art. 297**[1]A[bis]. Death of a parent

A[bis]. Death of a parent

[1] Amended by No I 1 of the Federal Act of 25 June 1976, in force since 1 Jan. 1978 (AS **1977** 237; BBl **1974** II 1).

[2] Inserted by No I of the Federal Act of 21 June 2013 (Parental Responsibility), in force since 1 July 2014 (AS **2014** 357; BBl **2011** 9077).

**Art. 301a**[1]B. Scope / II. Deciding on the place of residence

II. Deciding on the place of residence

[1] Parental responsibility includes the right to decide on the child's place of residence.

[2] If parents exercise joint parental responsibility and if one parent wishes to change the child's place of residence, this requires the consent of the other parent or a decision of the court or the child protection authority if:

a.
    the new place of residence is outside Switzerland; or
b.
    the change of place of residence has serious consequences for the ability of the other parent to exercise parental responsibility and have contact.

[3] If one parent has sole parental responsibility and if he or she wishes to change the child's place of residence, he must inform the other parent of this in good time.

[4] A parent who wishes to change his or her own domicile has the same duty to provide information.

[5] If required, the parents shall agree to modify the rules on parental responsibility, residence, contact and the child maintenance contribution in such a way as to safeguard the child's well-being. If they are unable to agree, the court or the child protection authority decides.

[1] Inserted by No I of the Federal Act of 21 June 2013 (Parental Responsibility), in force since 1 July 2014 (AS **2014** 357; BBl **2011** 9077).

**Art. 302**[1]B. Scope / III. Upbringing

III. Upbringing[2]

[1] The parents must raise the child according to their circumstances and encourage and safeguard the child's physical, mental and moral development.

[2] The parents must arrange for the child, especially if he or she has physical or learning disabilities, to receive an appropriate general and vocational education that corresponds as closely as possible to the child's abilities and inclinations.

[3] To that end, the parents must co-operate as appropriate with school authorities and, where required, with public and charitable youth support agencies.

[1] Amended by No I 1 of the Federal Act of 25 June 1976, in force since 1 Jan. 1978 (AS **1977** 237; BBl **1974** II 1).

[2] Amended by No I of the Federal Act of 21 June 2013 (Parental Responsibility), in force since 1 July 2014 (AS **2014** 357; BBl **2011** 9077).



**EXHIBIT**

K



Schweizerische Eidgenossenschaft
Confédération suisse
Confederazione Svizzera
Confederaziun svizra

Federal Department of Justice and Police FDJP
**Federal Office of Justice FOJ**
Private International Law Unit

KUE FOJ, Bundesrain 20, 3003 Berne, Switzerland

**FAX**

Office of Children's Issues
(CA/OCS/CI)
U.S. Department of State SA-29
2100 Pennsylvania Ave. NW, 4th
Floor
2201 C Street, N.W.
20037 Washington DC

Our reference : LK 158 /KUE / VAL

Berne, 29 September 2016

**Hague Convention of October 25, 1980 on the civil aspects of international child abduction (HC 80)**

Dear Central Authority from the United States,

Mr. Bordelais asked us for a determination according to Art. 15 HC 80 in order to prove that the removal of his daughter to the US was wrongful within the meaning of Art. 3 HC 80. Our Central Authority cannot provide such a determination, however, on the basis of the information available to us at the present moment and pursuant to Art. 8 par. 3 lit. f HC 80 the Swiss Central Authority kindly asks you to note the following.

Based on the information supplied by the applicant, ▇▇▇ parents are married and exercising joint custody of the child (art. 296 Swiss Civil Code).

As for the legal situation, we can state the following: According to Art. 301a of the Swiss Civil Code parental responsibility includes the right to decide on a child's place of residence. This legal rule is applicable to all holders of the parental responsibility. A parent who exercises joint parental responsibility is only allowed to transfer the residence of the child to another country with the consent of the other parent or in accordance to a decision made by a court or a child protection authority. As a result, the transfer of a child to another country without consent or such a decision is wrongful in the sense of Art. 3 lit. a HC 80.

Joëlle Schickel-Küng
Bundesrain 20, 3003 Berne, Switzerland
Telephone : +41 58 462 41 08+41 (0)58 460 5201
joelle.schickel@bj.admin.ch
http://www.bj.admin.ch

2 6 6 1/K 0000007/55/K2016G00825/P394-0119



2

In this case, concerning ███████████ as explained in our letter from July 15th this year, the situation is the following:

To our knowledge, ██████ parents are married and therefore have joint parental responsibility (art. 296 Swiss civil code) over their child. According to our explanations above and to Art. 301a of the Swiss civil code, the child may only move abroad permanently with the consent of the other parent or based on a final decision made by a court or the child protection authority. In the present case, the applicant father did not give his consent to a stay in the US and, as far as we know, no final and enforceable judicial decision has been taken yet, since an appeal from the father against the first instance decision granting the mother sole custody is still pending.

Yours faithfully

Joëlle Schickel

**INCIDENT/INVESTIGATION REPORT**

| | |
|---|---|
| Agency Name | Case# 2016-008201 |
| Naperville Police Department | Date / Time Reported 07/22/2016 08:50 Fri |
| ORI IL 0221400 | Last Known Secure 07/18/2016 14:00 Mon |
| | At Found 07/18/2016 14:00 Mon |

**INCIDENT DATA**

| Location of Incident | Premise Type | Zone/Tract |
|---|---|---|
| 2650 Copperfield Ct, Naperville IL 60565- | Single Family | 09, 22 |

| #1 | Crime Incident(s) (Att ) | Weapon / Tools NONE | | | Activity |
|---|---|---|---|---|---|
| | Despondent / Suicidal Subject 7541 | Entry | Exit | Security | |
| #2 | Crime Incident ( ) | Weapon / Tools | | | Activity |
| | | Entry | Exit | Security | |
| #3 | Crime Incident ( ) | Weapon / Tools | | | Activity |
| | | Entry | Exit | Security | |

MO

**VICTIM**

| # of Victims 0 | Type: | | Injury: | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| V1 | Victim/Business Name (Last, First, Middle) | | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | Home Phone | | |
| Employer Name/Address | | | | | Business Phone | | Mobile Phone | |
| VYR | Make | Model | Style | Color | Lic/Lis | | VIN | |

CODES: V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim)

**OTHERS INVOLVED**

| Type: INDIVIDUAL | | Injury: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code IO | Name (Last, First, Middle) | Victim of Crime # | DOB Age 12 | Race W | Sex F | Relationship To Offender | Resident Status Non-Resident | Military Branch/Status |
| Home Address 2650 Copperfield Ct Naperville, IL 60565 | | | | | | | Home Phone | |
| Employer Name/Address | | | | | Business Phone | | Mobile Phone | |

| Type: INDIVIDUAL | | Injury: | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code IO | Name (Last, First, Middle) BORDELEIS, VALERIE A | Victim of Crime # | DOB Age 50 | Race W | Sex F | Relationship To Offender | Resident Status Resident | Military Branch/Status |
| Home Address 2650 Copperfield Ct Naperville, IL 60565 | | | | | | | Home Phone | |
| Employer Name/Address | | | | | Business Phone | | Mobile Phone | |

**PROPERTY**

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Officer/ID# | GIBLER, E. L. (4957) | | | |
|---|---|---|---|---|
| Invest ID# | GIBLER, E. L. (4957) | Supervisor | MCANALLY, J. P. (3715) | |
| Complainant Signature | | Case Status Inactive 07/25/2016 | Case Disposition: | Page 1 |

Status

R_CS11BR          Printed By: REAVYC, DTA1          Sys#: 958107          07/25/2016 16:36

## Incident Report Additional Name List

*Naperville Police Department*

OCA: *2016-008201*

### Additional Name List

| Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|
| 1) IO 3 | BORDELAIS, ANTOINE | | | 53 | W | M |
| Address | 28A Chemin Des Marais - Commugny , Switzerland, IL | | H: - - | | | |
| Empl/Addr | | | B: - - | | | |
| | | | Mobile #: - - | | | |
| 2) IO 5 | STILWELL, GAIL A | | | 77 | W | F |
| Address | 2650 Copperfield Ct , Naperville, IL 60565- | | H: - - | | | |
| Empl/Addr | | | B: - - | | | |
| | | | Mobile #: - - | | | |
| 3) IO 6 | CROTTY, DR | | | | | |
| Address | 801 S Washington St , Naperville, IL 60540- | | H: 630-527-3355 | | | |
| Empl/Addr | | | B: - - | | | |
| | | | Mobile #: - - | | | |
| 4) IO 4 | STILWELL, RICHARD | | | 80 | U | M |
| Address | 2650 Copperfield Ct , Naperville, IL | | H: | | | |
| Empl/Addr | | | B: - - | | | |
| | | | Mobile #: - - | | | |

## INCIDENT/INVESTIGATION REPORT

*Naperville Police Department*

Case # *2016-008201*

Status Codes  1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D R U G S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

NARRATIVE

## CASE SUPPLEMENTAL REPORT

Printed: 07/25/2016 16:36

*Naperville Police Department*

OCA: **2016008201**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *INACTIVE*          **Case Mng Status:** *INACTIVE*          Occurred: *07/18/2016*

1  **Offense:** *DESPONDENT / SUICIDAL SUBJECT*

**Investigator:** *GIBLER, E. L. (4957)*          Date / Time: *07/22/2016 09:18:26, Friday*

**Supervisor:** *MCANALLY, J. P. (3715)*          Supervisor Review Date / Time: *07/25/2016 14:24:15, Monday*

**Contact:**          Reference: *Supplemental*

---

07/18/2016  1400 hours

I (Det. Erin Gibler 4957) was informed by Sgt. T. Black that NPD Social Worker Eirene Leventes had received a voice message from a subject, Antoine Bordelais, who is residing in Switzerland and reporting a parental abduction. Sgt. Black then received information from the Office of Children's Issues in Washington DC in reference to 12 year old,

2  ████████████ who was removed from Switzerland by her biological mother, Valeris Bordelais, without the consent of the biological father, Antoine Bordelais. There was written expressed concern over ██████ mental health due to previous suicide attempts and depression. Antoine wanted NPD to confirm that Valerie and ████ were in fact at the residence of Valerie's parents in Naperville and to check on ████ well-being. Please see attached paperwork that was provided to NPD from Antoine.

NPD Social Worker Eirene Leventes and I attempted verification at 2650 Copperfield Court in Naperville. We learned that Valerie's parents; Richard and Gail Stilwell, resided at this location. We have not had any recent contact with Richard and Gail Stilwell or ██████████████

I met with Richard and Gail at the residence and identified myself as a detective with NPD and identified Eirene as a social worker with NPD. They confirmed that ████ and Valerie were staying at their house during "holiday". I observed that the house was well-kept, clean and organized. A young female approached the door and was introduced as ████ She appeared to be dressed appropriately, spoke fluent English and physically healthy. We asked if we could speak with ████ and Valerie. Gail informed us that Valerie was not home at the moment but should be home in the next twenty minutes. ████ and Gail agreed that we could speak with ████ in the front living room of the residence privately. Gail asked ████ several times if she felt comfortable talking with us alone and ████ stated several times that she did and wanted to.

3  ████ related the following in summary. She and her mom have been in the United States for approximately four (4) weeks. ████ was not happy about this and expressed that she did not like the United States, did not like staying at her grandparents and wanted to return to Switzerland immediately. She gave numerous reasons as to not liking it at her grandparents; she had to share a room with her mother, the house was cluttered, she had numerous rules to follow and her grandmother was over-protective. She also stated that she was enrolled in equestrienne training and had a competition this coming weekend. She spoke very highly of the equestrienne training facility, Fields and Fences and was really excited about the competition.

4  ████ was upset with her mother for lying to her about taking a "holiday" in the United States because ██████ believed that they were not returning to Switzerland. She is not allowed to contact her father due to her mother's

---

Investigator Signature          Supervisor Signature

*r supp3*          Page 1

**CASE SUPPLEMENTAL REPORT**

Printed: 07/25/2016 16:36

*Naperville Police Department*

OCA: **2016008201**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *INACTIVE*          Case Mng Status: *INACTIVE*          Occurred: 07/18/2016

Offense: *DESPONDENT / SUICIDAL SUBJECT*

Investigator: *GIBLER, E. L. (4957)*          Date / Time: *07/22/2016 09:18:26, Friday*

Supervisor: *MCANALLY, J. P. (3715)*          Supervisor Review Date / Time: *07/25/2016 14:24:15, Monday*

Contact:          Reference: *Supplemental*

---

rules, but secretively Skyped him the day before from her Kindle Fire. She told him that she was in Naperville and that she did not want to stay in the USA any longer. ▬▬▬ speaks very intelligently and appears to have a very good grasp on the situation involving her mother and father. ▬▬▬ related that her and her mother left her father in December

5  2014 and they have since been going to court for custody over ▬▬▬ since. She believes that her mother has made up many statements against her father that were untrue but that her father does not follow the custody agreement either.

;   She knows that her father has not paid any child support and that her mother cannot afford to live in Switzerland any longer. She also mentioned that her father would appear at her school and camp without any notification and that

7  would cause her stress and anxiety. Since being in the United States she has had suicidal thoughts and expressed that she also has a plan to complete her own suicide by jumping out of a window.

8  ▬▬▬ further related that she has attempted suicide in the past by taking medications, jumping out of a window that was not high enough to complete the job and laying in a busy parking lot hoping to be run over by a vehicle. She then showed us some old scratches and scabs on her right knee stating that they were caused when she tried to jump out of another window in Switzerland. ▬▬▬ stated that she knows she will not live past the age of sixteen (16) and that she would use a gun if she had access to one because she heard that if she shot herself in the head, she would die instantly. ▬▬▬ admitted that she was hospitalized for one (1) week due to similar thoughts and actions while in Switzerland. She believed this took place in January of 2016.

9  ▬▬▬ was asked what would cause her to attempt suicide and ▬▬▬ related that she has a lot of stress and anxiety about what was going on with her mother and father. She also stated that her mother pushes her over the edge at times and she struggles to communicate with her. She expressed a high interest in going back to Switzerland to live with her father but knew that there was an active order against him not allowing that to take place. ▬▬▬ was not opposed to

10  receiving treatment and commented that she had seen a psychiatrist in Switzerland but did not like her and felt she did not listen to ▬▬▬

1445 hours

Valerie Bordelais returned home and entered the living room. ▬▬▬ agreed to go upstairs while we spoke with Valerie. She related the following in summary. She and ▬▬▬ came to Naperville approximately four (4) weeks ago and have a return flight home for August 1, 2016. Valerie has sought legal advice while in the United States in hopes of being able to stay here longer or indefinitely with ▬▬▬ Valerie cited numerous incidents when Antoine was physical abusive towards her. She and ▬▬▬ left, staying at friends and then eventually getting her own apartment.

11  She has begun the separation procedure in Switzerland which forces married couples to be legally separated for at least two (2) years before they will grant a divorce. Valerie did produce a copy of an Order of Protection against Antoine,

---

Investigator Signature                    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/25/2016 16:36

OCA: **2016008201**

*Naperville Police Department*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *INACTIVE*　　　　**Case Mng Status:** *INACTIVE*　　　　**Occurred:** *07/18/2016*

　**Offense:** *DESPONDENT / SUICIDAL SUBJECT*

**Investigator:** *GIBLER, E. L. (4957)*　　　　　**Date / Time:** *07/22/2016 09:18:26, Friday*

**Supervisor:** *MCANALLY, J. P. (3715)*　　　**Supervisor Review Date / Time:** *07/25/2016 14:24:15, Monday*

　**Contact:**　　　　　　　　　　　　　　　　　　　**Reference:** *Supplemental*

---

protecting herself and ▓▓▓ beginning January 14, 2016. The document is in French and I was unable to understand the details. Valerie provided me with several names and numbers of different attorneys and child protection agents who were familiar with this case in Switzerland.

12　Valerie explained that she had 100% custody of ▓▓▓ throughout the separation and that she had told her attorneys that she was going to the United States on holiday, who she believed then informed Antoine. He had been granted supervised visitation with ▓▓▓ throughout the separation but he has chosen not participate. He frequently would show up unannounced at ▓▓▓ school and camps causing her great anxiety. He continued to violate the Order of Protection and they were attending several court dates due to that.

We explained to Valerie that we were there to check on ▓▓▓ mental health and after speaking with her, it was determined that she needed an evaluation at Edward Hospital. Valerie agreed with this and wanted to get ▓▓▓ as much help as necessary. ▓▓▓ was then transported via ambulance to Edward Hospital and Eirene traveled with her. Valerie agreed to forward me all documents involving custody, please see attached. It should be noted that most of these documents are in French.

We did meet with Edward Hospital staff; Pediatrics Emergency Doctor Crotty and Linden Oaks Intake Counselor Jessica Nemeth and provided them with a summary of our discussion with ▓▓▓ Valerie and Gail arrived at Edward Hospital and was waiting to speak with the doctors when we left. I was late informed that ▓▓▓ was kept for in-patient evaluation

I informed Sgt. Black of the results from our visit and he was unaware of the Order of Protection, stating that Antoine did not inform him of that.

07/19/2016

We received more documents from Antoine, please see attached copies. I have also attached all correspondence with Antoine that we have had via e-mail.

I also received information from Eirene that a member of the US Department of State was now involved in the case; Abduction Prevention Officer Darlene.

I contacted her and she related the following. Antoine had contacted them in reference to the possible abduction of his daughter from Switzerland. He was instructed to file a petition with the Hague Convention if he wanted to pursue the

---

Investigator Signature　　　　　　　　　　　　Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/25/2016 16:36

*Naperville Police Department*

OCA: **2016008201**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *INACTIVE*          **Case Mng Status:** *INACTIVE*          **Occurred:** *07/18/2016*

**Offense:** *DESPONDENT / SUICIDAL SUBJECT*

**Investigator:** *GIBLER, E. L. (4957)*          **Date / Time:** *07/22/2016 09:18:26, Friday*

**Supervisor:** *MCANALLY, J. P. (3715)*          **Supervisor Review Date / Time:** *07/25/2016 14:24:15, Monday*

**Contact:**          **Reference:** *Supplemental*

---

matter any further. She also provided me with agents name from the Office of Children's Issues in Washington DC, Adam Clark, who will be handling the case.

07/20/2016

I contacted Valerie via telephone who related that ▓▓▓ was going to be released from Linden Oaks later that night. She also agreed to meet with me and Eirene the following day at NPD.

07/21/2016 1500 hours

Eirene and I met with Valerie in the front lobby of the police department. She related the following in summary.
▓▓▓ was released with no follow-up care suggested from Edward Hospital. She has contacted a private counselor from Downers Grove and has arranged a initial visit. She confirmed again that they do have round trip flights home to Switzerland on August 1, 2016 but admitted that she is re-considering returning and will be seeking legal advice here in the United States. I spoke with her about her future plans and she related that her parents are supporting her financially and she plans on looking for employment and a residence in this area. She also wants to enroll ▓▓▓ in school here in Naperville.

I suggested that Valerie stay in touch with us while she is here and she agreed to do so. We also explained that we would be following up with ▓▓▓ in the next week.

04/22/2016

Eirene and I received several e-mails from Antoine, please see attached. I responded to him, providing him with the police report number and instructions to contact the Office of Children's Issues or the US Department of State, due to them having the authority over international custody. I also spoke with Agent Adam Clark from the Office of Children's Issues who related the following in summary. As of today's date, they mailed a letter to Valerie to the Naperville address informing her that Antoine had filed a Hague Application and was requesting her cooperation to work with Antoine or a mediator to return ▓▓▓ to Switzerland. If she refused to do so, then they would begin the court process to bring the matter in front of a judge. At this time, Agent Adam Clark advised that we did not have any authority to take custody of ▓▓▓

I have no further information. I request case closed.

---

Investigator Signature                    Supervisor Signature

M

# EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540

Adm: 7/18/2016, D/C: 7/18/2016

**ED Provider Notes by Crotty, Stephen C, MD at 7/18/2016 5:56 PM**

| | | |
|---|---|---|
| Author: Crotty, Stephen C, MD | Service: (none) | Author Type: Physician |
| Filed: 7/21/2016 10:54 PM | Note Time: 7/18/2016 5:56 PM | Note Type: ED Provider Notes |
| Status: Signed | Editor: Crotty, Stephen C, MD (Physician) | |

**Patient Seen in:** Edward Hospital Emergency Department

**History**

Patient presents with:
Eval-P (psychiatric)

Stated Complaint: SI

HPI

Patient is a 12-year-old female here for evaluation of suicidal ideation. She is originally from Switzerland and her parents separated. Her father does not have custody of her at this point. Her mother told her that she will be coming to America for short trip but has since kept her here over a month. The patient has become very anxious and depressed because she does not want to live here. She does have a history of depression and has had previous suicidal ideation and a suicide attempt about 9 months ago. She states she feels like hurting herself and has a plan to either shoot herself if she happens to come across a gun or jump from a high building. She states she has not done anything actively at this point to hurt herself.

**Past Medical History**
Diagnosis
· Suicidal behavior
· Esophageal reflux

**Past Surgical History**
OTHER SURGICAL HISTORY
        Comment  stitches to chin

Medications :
Fluticasone Propionate 50 MCG/ACT Nasal Suspension, by Each Nare route daily.
Fexofenadine HCl 30 MG/5ML Oral Suspension, Take 30 mg by mouth daily.
Vitamin C 500 MG/5ML Oral Syrup, Take 500 mg by mouth daily.
Dextromethorphan-Guaifenesin 5-100 MG/5ML Oral Syrup, Take 5 mL by mouth nightly.
Melatonin 5 MG/15ML Oral Liquid, Take 5 mg by mouth nightly.
Famotidine 10 MG Oral Chew Tab, Chew 10 mg by mouth 2 (two) times daily as needed for Heartburn.
Menthol (RICOLA MOUNTAIN HERB MT), Use as directed 1 lozenge in the mouth or throat every 2 (two) hours as needed.

**Family History**
Problem                              Relation                    Age of Onset
·

Generated on 9/13/2016 11:50 AM

# EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/18/2016

ED Provider Notes by Crotty, Stephen C, MD at 7/18/2016  5:56 PM (continued)

4

| | |
|---|---|
| Anxiety | Mother |
| · Depression | Mother |
| · Diabetes | Maternal Grandmother |
| · Depression | Maternal Grandmother |
| · Anxiety | Maternal Grandmother |
| · Diabetes | Maternal Grandfather |
| · Heart Disorder | Maternal Grandfather |
| · Cancer | Paternal Grandmother |
| · Alcohol and Other Disorders Associated | Paternal Grandfather |

Smoking Status: Never Smoker
Alcohol Use: No

Review of Systems

Positive for stated complaint: SI
Other systems are as noted in HPI.
Constitutional and vital signs reviewed.

All other systems reviewed and negative except as noted above.

PSFH elements reviewed from today and agreed except as otherwise stated in HPI.

## Physical Exam

BP 109/63 mmHg | Pulse 88 | Temp(Src) 98.9 °F (37.2 °C) (Temporal) | Resp 18 | Wt 41.4 kg | SpO2 98%

Physical Exam
HEENT: The pupils are equal round and react to light, oropharynx is clear, mucous membranes are moist.
Ears: left TM shows no erythema, right TM shows no erythema
Neck: Supple, full range of motion.
CV: Chest is clear to auscultation, no wheezes rales or rhonchi.  Cardiac exam normal S1-S2, no murmurs rubs or gallops.
Abdomen: Soft, nontender, nondistended.  Bowel sounds present throughout.
Extremities: Warm and well perfused.
Dermatologic exam: No rashes or lesions.
Neurologic exam: Cranial nerves 2-12 grossly intact.
Orthopedic exam: normal,from.

## ED Course

Labs Reviewed
DRUG SCREEN 7 W/OUT CONFIRMATION, URINE - Normal
  Narrative:
  Results of the Urine Drug Screen should be used only for medical purposes.
POCT PREGNANCY, URINE

Generated on 9/13/2016 11:50 AM

EDWARD

**EDW EDWARD**
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/18/2016

ED Provider Notes by Crotty, Stephen C, MD at 7/18/2016 5:56 PM (continued)

**MDM**

Patient presents for suicidal ideation and depression. She is accompanied by the local police detective and says worker who she has spoken with earlier today. She will be assessed by Linden Oaks. Further plan as per Linden Oaks.

**Disposition and Plan**

Clinical Impression:
Suicidal ideation (primary encounter diagnosis)

Disposition:
Psychiatric transfer

Follow-up:
No follow-up provider specified.

Medications Prescribed:
Discharge Medication List as of 7/18/2016 8:41 PM

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM

| | | |
|---|---|---|
| Author: Nemeth, Jessica, LPC | Service: (none) | Author Type: RRC Counselor |
| Filed: 7/18/2016 8:48 PM | Note Time: 7/18/2016 8:48 PM | Note Type: BH Comprehensive Assessment |
| Status: Signed | Editor: Nemeth, Jessica, LPC (RRC Counselor) | |

**Comprehensive Assessment Note**

General Questions
Why are you here?: "Well I think it's because I was having suicidal thoughts." Pt reports SI w/plan to jump out of a window or shoot herself today, but denies wanting to act on thoughts today but said, "only when I am 16." NO HI.
Precipitating Events: Pt reports parents have been separated for about 1 yr, in the middle of a divorce. Pt reports "I don't want to be w/ my mom. I want to be w/my dad." Pt reports father is currently in Switzerland. Pt lives in Switzerland w/ mother and mother has full custody.
History of Present Illness: hx of depression, pt reports seeing a psychiatrist, Madam Chabanne Frutigeur; inpt MH in Switzerland for SI x 9 mos ago
Collateral Information Obtained: In person, Collateral
Collateral Information: EDW ER staff, Per ER, Police social worker was notified by child protective services from Switzerland regarding child wellbeing due to being taken out of the country with mom. Mom and dad are in the process of divorce and order protection for the child not to be taken out of the country. Social worker was doing a well being check on the child grandparents house her in

Generated on 9/13/2016 11:50 AM

**EXHIBIT**

N

EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540

Adm: 7/18/2016, D/C: 7/18/2016

ED Provider Notes by Crotty, Stephen C, MD at 7/18/2016 5:56 PM (continued)

**MDM**

Patient presents for suicidal ideation and depression. She is accompanied by the local police detective and says worker who she has spoken with earlier today. She will be assessed by Linden Oaks. Further plan as per Linden Oaks.

**Disposition and Plan**

Clinical Impression:
Suicidal ideation (primary encounter diagnosis)

Disposition:
Psychiatric transfer

Follow-up:
No follow-up provider specified.

Medications Prescribed:
Discharge Medication List as of 7/18/2016 8:41 PM

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM

| | | |
|---|---|---|
| Author: Nemeth, Jessica, LPC | Service: (none) | Author Type: RRC Counselor |
| Filed: 7/18/2016 8:48 PM | Note Time: 7/18/2016 8:48 PM | Note Type: BH Comprehensive Assessment |
| Status: Signed | Editor: Nemeth, Jessica, LPC (RRC Counselor) | |

**Comprehensive Assessment Note**

General Questions
1. Why are you here?: "Well I think it's because I was having suicidal thoughts." Pt reports SI w/plan to jump out of a window or shoot herself today, but denies wanting to act on thoughts today but said, "only when I am 16." NO HI.
2. Precipitating Events: Pt reports parents have been separated for about 1 yr, in the middle of a divorce. Pt reports "I don't want to be w/ my mom. I want to be w/my dad." Pt reports father is currently in Switzerland. Pt lives in Switzerland w/ mother and mother has full custody.
   History of Present Illness: hx of depression, pt reports seeing a psychiatrist, Madam Chabanne Frutigeur; inpt MH in Switzerland for SI x 9 mos ago
   Collateral Information Obtained: In person, Collateral
   Collateral Information: EDW ER staff, Per ER, Police social worker was notified by child protective services from Switzerland regarding child wellbeing due to being taken out of the country with mom. Mom and dad are in the process of divorce and order protection for the child not to be taken out of the country. Social worker was doing a well being check on the child grandparents house her in
3.

Generated on 9/13/2016 11:50 AM

# EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM (continued)

4. Naperville. Social worker states pt "states she is very sad and negative thought and SI thoughts, recent." SW states she has had problem with this is in Switzerland. Pt brought her for eval. Pt plans are to jump out of the window and if she had a gun if she gets access. This writer also spoke to Naperville detective Erin Gibler #4957 630-305-5453 in person and Naperville social worker Eirene Lewis #8696 (office phone 630-420-6174) /cell phone 630-774-7812. Per Naperville detective Erin Gibler, pt's parents are in the middle of a very volatile divorce. Pt mother has 100% custody and father has supervised visits. Pt mother brought pt to US to visit her grandparants and pt father called police and told them that pt was abducted by mother. Per Naperville detective FBI contacted Naperville police, and they discovered pt was not abducted by mother. Pt father has a restraining order against him and is only allowed supervised visits w/ pt.

Family Collateral
Family Collateral: pt mother- Valerie

5. Reason Patient is Here Today: Pt father called the authorities and told them pt was kidnapped. Police came to do a wellness check. Pt told police she was suicidal w/ multiple plans and police called EMS. Pt was brought to EDW via ambulance. pt has hx of suicide attempts. Pt sees a psychiatrist. Per pt mother she brought pt to US because pt father was violating his restraining order and following them

6. and stalking them while in Switzerland. Pt father followed pt and mother on the way to her psychiatrist appt. 1 mo ago pt jumped out of a window while still in Switzerland and ran away to dad's house. Also 1 mo ago, that same day, pt became aggressive toward pt mother and threw books at her and threw water on mom when angry. Pt mom feels pt father is very verbally abusive and

7. manipulative and pt is stuck in the middle. Pt has a hx from an early age of getting injured more than the normal child and had a lot of accidents and injuries that could not be explained. 7 yrs ago. the family moved to Switzerland. Pt was born in England. Mom is American. Father is ~~Swiss~~ and speaks french. Dec 2014, pt mom received an order that pt and mother could leave their home and mom was granted sole custody of pt. Per mom, pt psychiatrist has told her that pt struggles w/ a conflict of loyalties. In 2013, pt drew a pic and gave it to her mother of a tombstone and her father being dead

8. and it had pt mother and pt happy. Per pt mother, pt father is very verbally abusive and continues to stalk them.

9. Family's Biggest Areas of Concern: Pt safety. Pt mother reports hx of SI and aggression towards pt mother when upset w/ pt mother.

Referral Source
Referral Source: Other Hospital
Hospital: Edward Hospital
Person/Contact Name: Emergency Dept

Suicide Risk
Current/Recent Suicidal Ideation: Yes
Date of Most Recent Suicidal Ideation: 07/18/16
Describe Current/Recent Suicidal Ideation: Pt reports when the cops came I had thoughts to jump out

10. a window or shoot myself. Pt states when I'm bored, "What would happen if i died?" x 2 days ago.
Current/Recent/Future Suicide Plan: Yes
Date of Most Recent Suicide Plan: 07/18/16
Describe Current/Recent/Future Suicide Plan: Pt reports when the cops came I had thoughts to jump out a window or shoot myself.
Current/Recent/Future Suicidal Intent: Yes

Generated on 9/13/2016 11:50 AM

**EDWARD**

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM (continued)

Date of Most Recent Suicidal Intent: 07/18/16

11. Describe Current/Recent/Future Suicidal Intent: pt reports planning on killing herself when she is 16.
Current/Recent Suicide Rehearsal: No
Suicide Attempt in past 14 days: No
Current/Recent Suicide Risk Mitigating Factors: "I don't know. I don't take myself seriously."
Current/Recent Suicide Risk Collateral Provided By:: pt mother
Describe Current/Recent/Future Suicide Risk Collateral: Per pt mother she was unaware that pt was suicidal

12. until Naperville PD came to grandparents house today.
Past Suicidal Ideation: Yes
Date of Past Suicidal Ideation: (9 mos ago)

13. Describe Past Suicidal Ideation: Pt reports 9 mos ago, jumped out of the window, 10 mos ago pt laid
down in a parking lot and was hoping a car would run her over.
Past Suicide Plan: Yes
Date of Past Suicide Plan: (9 mos ago)
Describe Past Suicide Plan: Pt reports 9 mos ago, jumped out of the window, 10 mos ago pt laid
down in a parking lot and was hoping a car would run her over.
Past Suicide Intent: Yes
Date of Past Suicide Intent: (9 mos ago)
Describe Past Suicide Intent: Pt reports 9 mos ago, jumped out of the window, 10 mos ago pt laid
down in a parking lot and was hoping a car would run her over. Pt
Past Suicide Rehearsal: No
Past Suicide Attempt: Yes
Date of Past Suicide Attempt: (9 mos, 10 mos)
Describe Past Suicide Attempt: Pt reports 9 mos ago, jumped out of the window, 10 mos ago pt laid
down in a parking lot and was hoping a car would run her over. Per pt mother, 1 mo ago, pt took 1

14. tablet of mom;s medications and 1 sleeping pill and told mom it was a suicide attempt. Pt mom called
psychiatrist immediately and psychiatrist confirmed meds would not harm pt.
As a Result of Your Past Suicide Attempt, Did You Expect to:: Die
Describe Past Expectation: "I don't know if I really wanted to die or if I just felt like i wanted my mom's

15. attention."
Past Suicide Risk Mitigating Factors: "I don't know. It is like I was a different person and it's like I have
2 personalities."
Past Suicide Risk Collateral Provided By:: pt mother
Describe Past Suicide Risk Collateral: Per pt mother, 1 mo ago, pt took 1 tablet of mom;s medications
and 1 sleeping pill and told mom it was a suicide attempt. Pt mom called psychiatrist immediately and

16. psychiatrist confirmed meds would not harm pt. Pt mother is unsure if pt is really trying to kill self via
attempts or trying to get attention.

Danger to Others/Property
Current/Recent Harm Toward Others: No
Past Harm Toward Others: Yes

17. Person(s) Involved in Past Harm Toward Others: Pt reports at age 9, she became angry at a teacher
and punched her in her leg out of anger. However pt mom reports aggression approximately 1 mo
ago, while still living in Switzerland, pt mother reports 1 mo ago, pt became aggressive towards mom
and threw books at mom when angry at mom. Pt later that night knocked on mom's bedroom door
and told mom that she wanted to apologize to mom and when mom opened the door, pt threw water
at mom.

Generated on 9/13/2016 11:50 AM

EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016  8:48 PM (continued)

Past Harm Toward Others Ideation: No
Past Harm Toward Others Plan: No
Past Harm Toward Others Intent: No
Past Harm Toward Others Rehearsal: No
Past Harm Toward Others Threat/Attempt: No
Past Harm Toward Others Mitigating Factors: Pt denies wanting to hurt others.
Current or Past Harm Toward Animals: No
History or Allegations of Inappropriate Physical Contact: No
Current/Recent Destructive Behavior Toward Property: No
Past Destructive Behavior Toward Property: Yes
Describe Past Destructive Behavior Toward Property: Pt reports 2 mos ago wrote a poem for her mom and got angry w/ her so ripped it up.
Danger to Others/Property Collateral Provided By: pt mother
Describe Danger to Others/Property Collateral: pt mother reports 1 mo ago, pt became aggressive towards mom and threw books at mom when angry at mom. Pt later that night knocked on mom's bedroom door and told mom that she wanted to apologize to mom and when mom opened the door, pt threw water at mom.


Access to Means
Access to Means: Yes
Description of Access: household items
Access to Firearm/Weapon: Yes
Current Location of Firearm/Weapon: pt reports grandfather has shooting guns, but she knows she keeps them unloaded and pt does not know where the gun cabinet is and does not know where the key is located
Firearm/Weapon Secured: yes
Discussion for Removal: n/a
Do you have a firearm owner ID card?: No
Access to Means Collateral Provided By:: pt mother
Describe Access to Means Collateral: Per pt mother, pt does not have access to pt's grandfather guns and reports that they are kept in the basement in a locked cabinet.


Self Injury
History of Self Injurious Behaviors: Yes
Date of Past Occurence: 07/18/16

18. Describe Past Self-Injurious Behaviors: pt reports 11 mos ago cut herself w/ a knife to self injure. Pt reports scratching her arm when she is anxious.
Present Self-Injurious Behaviors: Yes
Self-Injurious Thoughts/Impulses: Sporadic
Type of Injuries: Scratch
Describe Type of Injuries: pt scratches self 1x per mo

19. Triggers to Self Injury: anxiety, stress
Object(s) Used: Finger nail
Area(s) of Body Injured: Arm
Describe Area(s) of Body Injured: left forearm
Frequency: Monthly
Describe Frequency: 1x per mo

Generated on 9/13/2016 11:50 AM

EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM (continued)

Severity: Superficial

20. Describe Severity: Pt scratched her left forearm in front of this writer to demonstrate how she self injures. Pt scratched arm several times. Superficial scratches.
Date of Most Recent Occurence: 07/18/16

Mental Health Symptoms
Hallucination Type: Auditory

21. Describe Hallucinations: pt reports 1 yr ago began hearing her fatehr's voice saying "I love you and I miss you" or "I will do anythign to get you back." Pt reports also hearing her pony's voice neighing after he passed away 6 mos ago. Pt reports hearing a dog bark 2 mins ago and reports the Naperville detective and social worker did not hear a dog.
Delusions: No problems reported or observed

22. Depression Symptoms: Feelings of hopelessess;Feelings of helplessness;Feelings of worthlessness;Impaired concentration;Crying;Isolative;Loss of interest;Change in energy level
Depression Description: pt reports less energy for last 3-4 weeks. Pt has been in USA for 1 mo.
Anxiety Symptoms: Generalized;Panic attack;Shaking;Shortness of breath
Panic Attacks: pt reports hx of panic attacks, last time was 2 mos ago.
Trauma Reaction: Other
Bipolar Symptoms: No problems reported or observed
Sleep Pattern: Sleeps all night

23. Number of Sleep Hours: 10 Hours
Use of Sleep Aids: melatonin
Appetite Symptoms: Normal for patient
Unplanned Weight Loss: No
Unplanned Weight Gain: No
History of Eating Disorder: No
Active Eating Disorder: No

Current/Previous MH/CD Providers
Hospitalizations, Placements, Therapy, Detox: Yes

24. Current Psychiatrist
Current Psychiatrist: Madam Chabanne Frutigeur in Switzerland
Dates of Treatment: 1 yr-present
Date Last Seen: 5-6 wks ago
Reason: med management

25. Effectiveness: "I don't like her."

Prior Other Inpatient
Name: Hospital in Switzerland
Dates of Treatment: 9 mos ago

Generated on 9/13/2016 11:50 AM

EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM (continued)

Date Last Seen: 9 mos ago
Reason: SI, attempt
Effectiveness: Per pt mother, pt was supposed to be admitted to adolescent psych unit, but they did
not have a bed in Switzerland, so was admitted for several days to the pediatric unit where a
psychiatrist met w/ pt daily.

26.

Current/Previous MH/CD Treatment
Recovery Support Groups: Denies Past History
History of Seclusion/Restraint: No

Addictions Screen
Do you sometimes drink beer, wine or other alcohol beverages?: No
Tobacco Use: Never smoked/never used tobacco product
Caffeine (include beverages/tablets) Use: No
Used substances (other than as prescribed) in the past 30 days?: No
Chemical Abuse Screen
Tobacco Use: Never smoked/never used tobacco product
Used substances (other than as prescribed) in the past 30 days?: No

Withdrawal Symptoms
History of Withdrawal Symptoms: Denies past symptoms
Current Withdrawal Symptoms: No
Process Addiction/ Behaviors
Repetitive/Compulsive Behaviors in the past 30 days: No

Functional Impairment
Currently Attending School: Yes (8th grade, school in Switzerland)
School Issues: Denies school issues;Other (Comment)
Describe Issues: Pt mother reports that pt has been out of school since March 2016, due to
restraining order against pt father. PT father used to show up on school grounds to torment pt and
mother did not feel safe sending pt to school. Per pt mother, pt had to have recess in isolation so pt
father could not get acess to pt while pt mother is at work and pt is in school. Per pt mother, school
was not very helpful.
Job Issues: Other (comment)
Concerns/Conflicts with Social Relationships: Yes
Decreased Functional Ability: Other (comment)

27.

Generated on 9/13/2016 11:50 AM

**EDWARD**

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM (continued)

Do you have any prior/current legal concerns?: Other (comment)
History of Gang Involvement: No

28. Support Systems: Parent;Family members (Pt mother and pt are staying w/ Grandma and Grandpa )
Living Arrangements: Parent(s) (mother, grandparents in Naperville currently/ mother and pt have an apt in Switzerland as well)
Type of Residence: Private residence

Abuse Assessment

29. Physical Abuse: Yes, past (Comment) (pt father age 9)
Verbal Abuse: Yes, past (Comment) (pt father in the past)
Sexual Abuse: Denies
Neglect: Denies
Does anyone say or do something to you that makes you feel unsafe?: No
Have You Ever Been Harmed by a Partner/Caregiver?: No
Health Concerns r/t Abuse: No
Possible Abuse Reportable to:: Not appropriate for reporting to authorities

Mental Status
Appearance Characteristics: Appropriate clothing;Good hygiene

30. Mood: Anxious;Helpless;Hopeless;Worthless, low self esteem
Affect: Congruent
Eye Contact: Good
Level of Consciousness: Alert

31. Exhibited Behavior : Appropriate to situation;Cooperative;Fidgety;Participated;Tearful
Gait/Movement: Steady;Coordinated
Speech Characteristics: Normal volume;Normal rhythm;Normal rate
Concentration: Unimpaired
Memory: Recent memory intact;Remote memory intact
Orientation Level: Oriented X4
Thought Characteristics: Alert;Preoccupied;Coherent
Judgment: Poor (Comment)
Insight: Poor (Comment)

Assessment Summary

Assessment Summary: Pt is 12 y/o female who was brought to EDW ER by EMS after pt father who lives in Switzerland called authorities and reported that pt had been abducted by her mother. FBI contacted Naperville police and Naperville PD went to the home to meet w/ pt and mother. Per Naperville PD, pt mother has sole custody, and pt father has a restraining order against him and supervised visits. Pt mother and father are in the middle of a divorce. Pt reported to Naperville PD today that she is suicidal w/ plan to jump out of a window or if she could get access to her grandfather's guns (whom she is staying with)woudl shoot herself. Pt also told this writer and Naperville PD that she doubts she will make it to her 16th birthday. Pt was inpt 9 mos ago for suicide attempt in Switzerland. Pt has been in US for 1 mo and has been staying w/ her mother and grandparents. Pt has 2 previous suicide attempts 9 mos ago jumped out of a window and 10 mos ago pt layed down in a parking lot and wanted a car to run her over. Pt mother is concerned for pt

32. safety. Pt mom is aware and in agreement w/ pt boarding on EDP.

Generated on 9/13/2016 11:50 AM

# EDWARD

EDW EDWARD
801 S. Washington Street
Naperville IL 60540



Adm: 7/18/2016, D/C: 7/20/2016

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:48 PM (continued)

Level of Care Recommendations

33. Consulted with: Dr. Ahmari recommended inpt admission and is in agreement w/ pt boarding on EDP.
Level of Care Recommendation: Inpatient Acute Care
Unit: Adolescent

34. Reason for Unit Assigned: age/diagnosis
Inpatient Criteria: 24 hr behavior monitoring;Suicidal/homicidal risk
Precautions: Suicide;Close Observation
Refused Treatment: No

Primary Psychiatric Diagnosis
Depressive Disorders: Unspecified Depressive Disorder

Patient Intent
1. Previous suicide attempt: Yes

35. 2. Imminent suicide risk: Yes
3. Suicide plan and means: Yes
Patient Mental Status
4. Severe Psychological distress or anguish: Yes
5. Self-loathing: Yes
6. Hopelessness: Yes
7. Agitation: No
8. Psychosis: No
9. View of death: Yes
10. Severe relational or situational stressors: Yes
Patient History
11. Family/Peer Suicidal History: No
12. Poor Social Support: Yes
13. Alcohol or Drug Abuse: No
Factors Mitigating Risk
Factors Mitigating Risk: "I don't know. I don't take myself seriously."
SRAT Review
Precautions: Suicide;Close Observation
SRAT reviewed with: Dr. Ahmari

BH Comprehensive Assessment by Nemeth, Jessica, LPC at 7/18/2016 8:50 PM

| Author: Nemeth, Jessica, LPC | Service: (none) | Author Type: RRC Counselor |
|---|---|---|
| Filed: 7/18/2016 8:50 PM | Note Time: 7/18/2016 8:50 PM | Note Type: BH Comprehensive Assessment |
| Status: Signed | Editor: Nemeth, Jessica, LPC (RRC Counselor) | |

Generated on 9/13/2016 11:50 AM

*TRANSLATION:*

**PRIOR Axelle**

**From:**
**Sent:** Wednesday August 17 2016 3:12pm
**To:** PRIOR Axelle
**Subject:** Re: News

Hello Axelle,

I had a good week-end.

I just sent a message to my father and if you want I can send it to you by email.

For the judge:

- I don't like America (I even hate it)
- the food is bad (I don't eat breakfast because it's not nice)
- I miss my father a lot
- I miss my dog a lot
- if you decide that I must stay in America I would like to see my family (on my father's side) before leaving
- I would like to pack my moving boxes myself

If I think of another reason I would let you know (Mrs Prior)

Good day,

Sent from my iPhone

**'PRIOR Axelle**

| | |
|---|---|
| **De:** | ████████ |
| **Envoyé:** | mercredi 17 août 2016 15:12 |
| **À:** | PRIOR Axelle |
| **Objet:** | Re: News |

Bonjour Axelle ,

Mon week-end c'est bien passe .

Je vien d'envoyer un message a mon Pere et si vous voulez je vous transmet l'e-mail .

Pour le juge :

- je n'aime pas l'amerique ( je deteste meme )
- la nouriture est mauvaise ( je ne mange pas je petit dejeuner Parce que c'est pas Bon )
- mon Pere me manque beaucoup
- n'a chienne me manque beaucoup
- si vous decider que je reste en Amerique je voudrai pouvoir voir ma famille ( du cote de mon Pere ) avant de partir
- je voudrai faire mes cartons de demenagement moi meme

Si je pense a une Autre raison je vous Redit ( Mme Prior )

Bonne journee ,

████████

Envoyé de mon iPhone

Le 15 août 2016 à 23:34, PRIOR Axelle <axelle.prior@bourgeoisavocats.com> a écrit :

████████

J'étais contente de pouvoir te parler vendredi passé.

J'espère que tu as passé un bon week-end ?

Ton papa me demande de tes nouvelles. Ce serait bien si tu pouvait lui en donner directement par email ; son adresse email est la suivante : antoine@bordelais.name

Mais surtout, ainsi que nous en avons parlé, je te laisse m'écrire dans un email ce que tu veux dire au juge, en Suisse. Ecris avec tes mots et avec ton cœur. Ne te stresse pas avec la forme ou l'orthographe. Et tu peux me dire « Axelle » ☺

C'est la meilleure façon que je vois, pour moi, de retranscrire ce que tu penses, ce que tu ressens et ce que tu aimerais.

Je t'embrasse,

Axelle

1

*TRANSLATION:*

**PRIOR Axelle**

| | |
|---|---|
| **From:** | ███████████████ |
| **Sent:** | Wednesday August 17 2016 3:28pm |
| **To:** | PRIOR Axelle |
| **Subject:** | Re: News |

Hello again Axelle,
I have 2 more reasons for the judge:

- I would like to see my father
- I would like to have contacts with him

Good day,

████████████

Sent from my iPhone

**PRIOR Axelle**

**De:** ████████████████████████
**Envoyé:** mercredi 17 août 2016 15:28
**À:** PRIOR Axelle
**Objet:** Re: News

Re-bonjour Axelle ,
J'ai encore 2 resond pour le juge :

- je voudrai voir mon Pere
- je voudrai avoir contact Avec Lui

Bonne journee ,

████████████████

Envoyé de mon iPhone

Le 17 août 2016 à 08:21, ████████████████████ > a écrit :

Bonjour Axelle ,

Mon week-end c'est bien passe .

Je vien d'envoyer un message a mon Pere et si vous voulez je vous transmet l'e-mail .

Pour le juge :

- je n'aime pas l'amerique
- mon Pere me manque beaucoup
Si vous decider que je reste en Amerique ;
- je voudrai faire mes cartons de demenagement moi meme Mais si se n'etre pas possible se n'est pas grave

Si je pense a une Autre raison je vous Redit ( Mme Prior )

Bonne journee ,

████████████████

Envoyé de mon iPhone

Le 15 août 2016 à 23:34, PRIOR Axelle <axelle.prior@bourgeoisavocats.com> a écrit :

Salut ████████

J'étais contente de pouvoir te parler vendredi passé.

J'espère que tu as passé un bon week-end ?

1

*TRANSLATION:*

**PRIOR Axelle**

**From:**
**Sent:**       Friday August 26  01:48am
**To:**            PRIOR Axelle
**Subject:**      Re: News

**Categories:**      Category red

Hello ,

I just thought about more things to say to the judge !

- I hate the food here
- school is really horrible
- I am fed-up that my mother tells me that if I don't go to school I go to hospital: for me that's far too much additional pressure which could be avoided
- I loved horse riding before but now I am far too sad to do what I love
- I have only 3 friends here
- I am being insulted at school

The advantages of returning to Switzerland:
- I will have less difficulties at school (because I'm struggling to write in English and the school staff don't want to help me)
- I will not have to loose all my friends in Switzerland
- I will be able to continue horse riding (because I will not be in hospital all the time)
- it will avoid having to explain to all my friends that I am moving because my mother is stupid
- I will be able to be again with my dog "Queenie" because I miss her terribly

That's it, good evening

Sent from my iPhone

**PRIOR Axelle**

| | |
|---|---|
| **De:** | |
| **Envoyé:** | vendredi 26 août 2016 01:48 |
| **À:** | PRIOR Axelle |
| **Objet:** | Re: News |
| | |
| **Catégories:** | Catégorie rouge |

Bonjour ,

Je vien de penser a encore des chose a dire au juge !

- je deteste la nouriture ici
- l'ecole est vraiment horrible
- j'en ai marre que m'a mere me dit que si je ne vais pas a l'ecole je vais a l'hopital : pour moi c'est beaucoup Trop de pression en plus qui pourrai etre eviter
- j'adorer l'equitation avant Mais maintenant je suis beaucoup Trop triste pour faire ce que j'aime
- J'ai seulement 3 amies ici
- je me Fait insulter a l'ecole

Les avantage de retourner en Suisse :
- j'aurai moin de problem a l'ecole ( car en anglais je n'arrive pas a ecrire et les personne a l'ecole ne veulent pas m'aider )
- je ne devrai pas perdrent tout mes amies en Suisse
- je pourrai retrouver l'equitation ( car je ne serai pas  tout le temps a l'hopital )
- sa evitra d'expliquer a tout mes amies que je demenage a cause de m'a mere qui est Bete
- je pourrai retrouver m'a chienne " Queenie " car Elle me manque terriblement

Voila , bonne soirée

Envoyé de mon iPhone

Le 17 août 2016 à 08:36, PRIOR Axelle <axelle.prior@bourgeoisavocats.com> a écrit :

> Re...
>
> Oui, pour répondre à ta question sur l'email à ton papa, oui, je veux bien que tu me le transmettes.
>
> Je t'embrasse,
>
> Axelle
>
> <image001.gif>
> Axelle PRIOR
>
> Avocate au Barreau
> FSA droit de la famille
> DESS en criminologie
> CP 5475 - Avenue de Montbenon 2
> CH - 1002 Lausanne
> Tel + 41 (21) 321 45 45 - Fax direct + 41 (21) 321 45 83

1

*TRANSLATION:*

**PRIOR Axelle**

| | |
|---|---|
| **From:** | ███████████████ |
| **Sent:** | Tuesday August 30 2016 02:01am |
| **To:** | PRIOR Axelle |
| **Subject:** | Re: News |

**Categories:**       Category red

Hello ,
I have more reasons for the judge .

- my mother told me that I was coming on vacations but she lied and is holding me here against my will
- my grand-parents are not welcoming me very nicely
- I don't like the food (proof: I don't eat breakfast)

Good evening ,

███████████

Sent from my iPhone

**PRIOR Axelle**

| | |
|---|---|
| **De:** | ▬▬▬▬▬▬ |
| **Envoyé:** | mardi 30 août 2016 02:01 |
| **À:** | PRIOR Axelle |
| **Objet:** | Re: News |
| | |
| **Catégories:** | Catégorie rouge |

Bonjour ,
J'ai encore des resond pour le juge .



- m'a mere m'a dit que je venait en vacance Mais m'a mentit et me tien ici contre mon souhait
- mes grand parent ne m'acceuille pas tres gentillement
- je n'aime pas la nourriture ( preuve : je ne mange pas le petit dejeuner )

Bonne soirée ,

▬▬▬▬▬▬

Envoyé de mon iPhone

Le 26 août 2016 à 01:41, PRIOR Axelle <axelle.prior@bourgeoisavocats.com> a écrit :

Salut ▬▬▬▬

J'ai bien reçu ton email.

Ce serait bien que je puisse parler un peu avec toi. J'ai demandé à ta maman, dans un email que je viens de lui envoyer, de me dire quand tu aurajs un moment pour un téléphone.

Je t'embrasse,

Axelle

<image001.gif>
Axelle PRIOR

Avocate au Barreau
FSA droit de la famille
DESS en criminologie
CP 5475 - Avenue de Montbenon 2
CH - 1002 Lausanne
Tel + 41 (21) 321 45 45 - Fax direct + 41 (21) 321 45 46
axelle.prior@bourgeoisavocats.com
www.bourgeoisavocats.com

*Cet e-mail est à l'attention exclusive de la personne à laquelle il est adressé, et peut contenir des informations privilégiées et/ou confidentielles. Si vous recevez ce message par erreur, il vous est*

**EXHIBIT**

*tabbies*

P

*TRANSLATION:*

**GENEVA UNIVERSITY HOSPITAL**

Mental health and psychiatric department

Service of psychiatric specialties
Program Couples and Families

**COUNTY COURT FOR THE COTE**
St-Cergue road 38
1260 Nyon

Geneva, August 29th, 2016

Subject:     Decision of 07.27.2016
                   Ref. No : JS 14.041125 /LGN/coi

Mr the Judge,

Further to your correspondence of August 23rd, 2016, we are disposed to accept the therapy mandate for the family Bordelais.

In highly conflicting situations of separation as the current one, we do not receive the ex-couple together in the first instance. The scars of separation must first be treated to render the future parental meetings constructive and to enable the end of the spirit of "reprisal", negative for the child.

We therefore propose preparatory work before receiving the parents together. The therapeutic process will take place in different phases, in an adaptable environment: each parent alone, each parent with his daughter, ▆▆▆ alone, et finally the parents together.

The duration of the therapy will largely depend on the motivation of the parents to move towards appeasement.

We ask that the tribunal decides upon which member of the family the sessions should be invoiced.

The therapy can start as soon as ▆▆▆ and her mother are in Switzerland and that the two parents have contacted our office.

Please receive, Mr the Judge, the expression of my best considerations.

Dre Katharina Auberjonois
Psychiatrist-Psychotherapist FMH
Doctor Asst Manager
Family and Couple Consultation

NB: We leave it to your care to communicate this correspondence to the individuals concerned.

**519**



 Hôpitaux
Universitaires
Genève

REÇU AU GREFFE DU
TRIBUNAL D'ARRONDISSEMENT

NYON, le  **3 0 AOÛT 2016**

LA GREFFIÈRE

Département de santé mentale et de
psychiatrie

Service des spécialités psychiatriques
Programme Couples et Familles

TRIBUNAL D'ARRONDISSEMENT
DE LA COTE
Route de Saint-Cergue 38
1260  Saint-Cergue

Genève le 29 août 2016

**Concerne** : Ordonnance du 27.07 2016,
N° réf : JS 14.041125 /LGN/coi

Monsieur le Juge,

Suite à votre courrier datant du 23 août 2016, nous sommes disposés à accepter le mandat
thérapeutique de la famille  Bordelais.

Dans les situations de séparation hautement conflictuelle comme la présente, nous ne recevons pas
dans un premier temps l'ex-couple ensemble. Les blessures de la séparation doivent d'abord être
traitées pour rendre les futures réunions parentales constructives et pour permettre de sortir d'un
esprit de « règlement de compte », délétère pour l'enfant.

Nous  proposons de ce fait un travail préparatoire avant de recevoir les parents ensemble. Le
processus thérapeutique se déroulera en différentes phases, en setting variable : chaque parent seul,
chaque parent avec sa fille, ███████ seule, et finalement les parents ensemble.

La durée de la prise en charge dépendra largement de la motivation des parents à aller vers un
apaisement.

Nous demandons que le tribunal décide sur quel membre de la famille les séances devraient être
facturées.

La thérapie peut commencer dès que ███████ et sa mère seront en Suisse et que les deux parents
auront pris contact avec notre consultation.

Veuillez agréer, Monsieur le Juge, l'assurance de ma considération distinguée.

Dr Katharina Auberjonois
Psychiatre-psychothérapeute FMH
Médecin adjointe
Responsable du Programme
Couples  et familles

PS : Nous vous laissons le soin de transmettre ce courrier aux personnes concernées.



**EXHIBIT**

*TRANSLATION:*

**GENEVA UNIVERSITY HOSPITAL**

Mental health and psychiatric department

Service of psychiatric specialties
Program Couples and Families

**COUNTY COURT FOR THE COTE**
St-Cergue road 38
1260 Nyon

FAX No 022/557 52 22

Geneva, November 29th 2016

Subject:     Decision of 07.27.2016 – Divorce upon unilateral petition BORDELAIS-STILWELL
             Your ref. TD16.033412/ERA/coi

Mr the Judge,

I acknowledge receipt of your fax of November 25th, 2016, relating to the mandate for family therapy for the family Bordelais-Stilwell.

The mandate referred to is not a continuation, but remains a therapy project, Mrs Bordelais-Stilwell still being in the United States of America. To date, it is limited to phones exchanges with Mr Antoine Bordelais and email exchanges with Mr Antoine Bordelais and Mrs Valerie Bordelais-Stilwell.

In such a complex case, with currently a complete rupture of contact between the father and his daughter ▮▮▮▮ as well as between the parents, a therapy by video-conference will not have the excepted outcome.
To evaluate the possible suffering of the child as well as her freedom to express herself, the therapist must imperatively meet her in person. Similarly for the evaluation of Mrs Valerie Bordelais-Stilwell.
Mr Bordelais will be received for a first session at our offices as soon as possible.

Thanking you for your consideration, would you please receive, Mr the Judge, the expression of my best considerations.

Dre Katharina Auberjonois
Psychiatrist-Psychotherapist FMH
Doctor Asst Manager
Family and Couple Consultation

NB: We leave it to your care to communicate this correspondence to the individuals concerned.

0223723329  00223723329  15:09:41  29-11-2016  1/1

**522**



**Hôpitaux Universitaires Genève**

Département de santé mentale et de psychiatrie

Service des spécialités psychiatriques
Programme Couples et Familles

TRIBUNAL D'ARRONDISSEMENT
DE LA COTE
Route de Saint-Cergue 38
1260   Nyon

FAX No 022/557 52 22     *original ⊕ courrier postale*

Genève, le 29 novembre 2016

Concerne :   Ordonnance du 27.07.2016 – Divorce sur demande unilatérale BORDELAIS-STILWELL
Vos Réf. TD16.033412/ERA/coi

Monsieur le Juge,

J'accuse réception de votre fax du 25 novembre 2016 relatif au mandat de thérapie de famille de la famille Bordelais-Stilwell.

Le mandat cité n'est pas une poursuite, mais demeure bien un projet de suivi, Madame Bordelais-Stilwell se trouvant toujours aux Etats Unis (USA). A ce jour, il se résume à des échanges téléphoniques avec Monsieur Antoine Bordelais et des échanges mails avec Monsieur Antoine Bordelais et Madame Valérie Bordelais-Stiwell.

Dans un cas aussi complexe, avec actuellement rupture complète de contact entre le père et sa fille,   ainsi qu'entre les parents, une prise en charge via une vidéo-conférence n'aura pas le succès escompté.
Pour évaluer la possible souffrance de l'enfant ainsi que la liberté de ses propos, le mandaté doit impérativement pouvoir la rencontrer personnellement. Idem pour l'évaluation de Madame Valérie Bordelais-Stiwell.
Monsieur Bordelais sera reçu pour un premier entretien dans nos locaux dans les meilleurs délais.

Vous remerciant de l'attention portée, je vous prie de recevoir, Monsieur le Juge, l'expression de ma considération la meilleure.

Dre Katharina Auberjonois
Psychiatre-Psychothérapeute FMH
Médecin Adjointe - Responsable
Consultation Familles et Couple

PS : Nous vous laissons le soin de transmettre ce courrier aux personnes concernées.

Rue de Lyon 89-91 - 1203 Genève / Tél. 022/372 33 01  - Fax : 022 372 33 29

# Exhibit R

**TRANSLATION**

**Swiss Appeal court**

Decision of April 19th, 2017

.........................

At the time of the removal of the child at the beginning of July 2016, the appellant held joint parental authority. Furthermore the decision attributing sole custody to the respondent had not yet come into force. The appellant did not consent to the move of the child ███ to the United States of America. For this reason, the move of the child to the United States of America was wrongful as specified by art. 7 sub-par 2 CLaH96

......................

Says that Antoine Bordelais will exercise his visitation rights with the child ███████ two hours every two weeks by way of Skype.



JS14.041125-161335
147

## COUR D'APPEL CIVILE

Arrêt du 19 avril 2017

Composition : M.   K A L T E N R I E D E R, juge délégué
Greffier :   M.   Hersch

\* \* \* \* \*

**Art. 5 § 2 et 7 § 1 et 2 CLaH96 ; 273 al. 1 et 298 al. 1 CC ; 299 al. 2 let. a CPC**

Statuant sur l'appel interjeté par **Antoine BORDELAIS**, à Commugny, requérant, contre le prononcé rendu le 25 juillet 2016 par le Président du Tribunal civil de l'arrondissement de La Côte dans la cause divisant l'appelant d'avec **Valérie BORDELAIS, NEE STILWELL**, à Naperville, Illinois, Etats-Unis, intimée, le Juge délégué de la Cour d'appel civile du Tribunal cantonal considère :

constant que l'appelant, alors titulaire de l'autorité parentale, n'a pas acquiescé au déplacement, respectivement au non-retour de l'enfant. Ainsi, la compétence du Juge délégué de céans, fondées sur les art. 5 § 2 et 7 § 1 CLaH96, est donnée. A cet égard, le fait que, comme l'avance l'intimée, des doutes subsistent quant à la réalité du domicile de l'appelant en Suisse, n'est pas pertinent, puisque le critère déterminant est celui de la résidence habituelle de l'enfant immédiatement avant le déplacement.

On l'a vu, au moment du déplacement de l'enfant au début du mois de juillet 2016, l'appelant était titulaire de l'autorité parentale conjointe. De plus, la décision attribuant la garde à l'intimée uniquement n'était pas encore en force. L'appelant n'a pas consenti au déplacement de l'enfant ███ aux Etats-Unis. Pour ces motifs déjà, le déplacement de l'enfant aux Etats-Unis était illicite au sens de l'art. 7 § 2 CLaH 96.

**6.**

**6.1**    Reste à déterminer les conséquences du déplacement illicite. L'appelant conclut en substance au rapatriement de l'enfant ███ en Suisse (cf. conclusions I.XIX et I.XIXa). Cette question se recoupe avec celle de l'attribution de l'autorité parentale. En effet, l'autorité parentale comprend le droit de déterminer le lieu de résidence de l'enfant (art. 301a CC). Or, le premier juge a attribué l'autorité parentale exclusivement à l'intimée. L'appelant a conclu à la réforme de l'ordonnance sur ce point, notamment en ce sens que l'autorité parentale conjointe soit maintenue (cf. conclusion IV). Il convient donc à ce stade d'examiner si c'est à juste titre que l'autorité parentale unique a été attribuée à la mère. Dans l'affirmative, cela aura pour effet que c'est désormais uniquement la mère qui dispose du droit de déterminer le lieu de résidence de l'enfant et que le rapatriement en Suisse ne peut lui être imposé. C'est seulement si l'autorité parentale conjointe est maintenue que la question d'un éventuel rapatriement se posera.

**6.2**    L'autorité parentale inclut, outre le droit de déterminer le lieu de résidence de l'enfant (art. 301a CC), le droit de déterminer les soins à lui donner (art. 301 CC) et de définir son éducation (art. 302 CC).

L'appel étant au final rejeté dans la mesure de sa recevabilité, les frais judiciaires de deuxième instance, qui s'élèvent à 4'140 fr., y compris l'indemnité allouée à Me Axelle Prior, curatrice de représentation de l'enfant Sophie, par 3'540 fr. (cf. art. 65 al. 2 TFJC [tarif des frais judiciaires civils du 28 septembre 2010 ; RSV 270.11.5], art. 95 al. 2 let. e CPC et art. 5 al. 1 RCur [règlement sur la rémunération des curateurs du 18 décembre 2012 ; RSV 211.255.2]), doivent être provisoirement laissés à la charge de l'Etat (art. 106 al. 1 et 122 al. 1 let. b CPC). L'appelant, qui succombe (art. 122 al. 1 let. d CPC) versera à l'intimée la somme de 3'000 fr. à titre de dépens de deuxième instance (art. 9 al. 2 TDC [tarif des dépens en matière civile du 23 novembre 2010 ; RSV 270.11.6]).

Le bénéficiaire de l'assistance judiciaire est, dans la mesure de l'art. 123 CPC, tenu au remboursement des frais judiciaires mis à la charge de l'Etat.

Par ces motifs,

le Juge délégué

de la Cour d'appel civile

p r o n o n c e :

I. L'appel est rejeté, dans la mesure de sa recevabilité.

II. Le prononcé est réformé d'office aux chiffres IV et V de son dispositif comme il suit :

    IV.    dit qu'Antoine Bordelais exercera son droit de visite sur l'enfant ████ à raison de deux heures toutes les deux semaines, par l'entremise de skype.

    V.    annulé.

Le prononcé est confirmé pour le surplus.

III. La décision du Président du 11 janvier 2017 relevant Me Axelle Prior de son mandat de curatrice de représentation de l'enfant ████ à forme

de l'art. 299 CPC est annulée d'office et le mandat de Me Axelle Prior est poursuivi.

IV. Les frais judiciaires de deuxième instance, arrêtés à 4'140 fr. (quatre mille cent quarante francs) pour l'appelant Antoine Bordelais, y compris l'indemnité allouée à Me Axelle Prior, curatrice de représentation de l'enfant Sophie, par 3'540 fr. (trois mille cinq cent quarante francs), sont provisoirement laissés à la charge de l'Etat.

V. Le bénéficiaire de l'assistance judiciaire est, dans la mesure de l'art. 123 CPC, tenu au remboursement des frais judiciaires mis à la charge de l'Etat.

VI. L'appelant Antoine Bordelais doit verser à l'intimée Valérie Bordelais la somme de 3'000 fr. (trois mille francs), à titre de dépens de deuxième instance.

VII. L'arrêt est exécutoire.

Le juge délégué :

Le greffier :

Du     2 1 AVR. 2017

Le présent arrêt, dont la rédaction a été approuvée à huis clos, est notifié en expédition complète à :

- Antoine Bordelais,
- Me Patricia Michellod (pour Valérie Bordelais),
- Me Axelle Prior (pour l'enfant ▮▮▮▮▮